680 F.2d 979
 110 L.R.R.M. (BNA) 3097, 94 Lab.Cas. P 13,678
 Paul E. SCOTT, et al., Plaintiffs-Appellees,
v.
Bill MOORE, et al., Defendants,
Laborers International Union of North America, Local No.
870, et al., Defendants-Appellants,
International Union of Operating Engineers, etc., AFL-CIO,
Local 450, Defendant-Appellant.
 No. 79-1196.
 United States Court of Appeals,
Fifth Circuit.*
 July 1, 1982.
 
 Martin W. Dies, Orange, Tex., for defendants-appellants.
 Robert Q. Keith, Arthur R. Almquist, Beaumont, Tex., for plaintiffs-appellees.
 Laurence Gold (AFL-CIO), Washington, D. C., for amicus curiae.
 John H. Smither, Houston, Tex., for Assoc. Bldg. & Const.
 David Crump, Houston, Tex., David T. Bryant, Nat. Right To Work Legal Defense Foundation, Inc., Springfield, Va., for Legal Foundation of America.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before GODBOLD, Chief Judge, BROWN, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK, WILLIAMS and GARWOOD, Circuit Judges.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 This appeal presents important questions concerning the scope of relief available under 42 U.S.C. § 1985(3), the extent of congressional power to enact a civil remedy for wholly private infringement of constitutional rights, and the relationship between section 1985(3) and the labor relations laws. The district court, 461 F.Supp. 224, issued a permanent injunction against the defendants, including numerous labor organizations. It also awarded money damages for violations of section 1985(3), concluding that the statute afforded a remedy for the kind of private conspiracy involved here and that Congress was constitutionally empowered to provide such a remedy. A panel of this court affirmed in part and reversed in part. 5th Cir., 640 F.2d 708. After rehearing, the court en banc affirms the district court in part and reverses in part.
 
 I. THE FACTUAL BACKGROUND
 
 2
 This case arises out of an episode of mob violence that occurred in the early morning hours of January 17, 1975. The plaintiffs are A.A. Cross Construction Company, Inc., and two of its employees, Paul Scott and James Matthews. The defendants include the Sabine Area Building and Construction Trades Council, a loose confederation of craft and construction unions located in the Port Arthur, Texas, area. Also named as defendants are twenty-five of the Council's member unions and several individual members of some of these labor unions. The individual defendants are not parties to this appeal. The plaintiffs contend that the defendants conspired for the purpose of depriving them of the equal protection of the laws and equal privileges and immunities under the law when they planned and executed an attack on the Cross construction site, assaulting workers and destroying property.
 
 
 3
 A.A. Cross Construction Company is a Texas corporation engaged in the building and construction industry as a general contractor. In May, 1974, Cross contracted with the Department of the Army, United States Corps of Engineers to erect the Alligator Bayou Pumping Station and Gravity Drainage Structure on the hurricane levee along Taylor's Bayou near Port Arthur. The agreement had a contract price in excess of $8 million and called for the construction of the pump station with four pumps and a gravity drain for flood control. In accordance with its customary practice, the Cross Construction Company hired its workers for the Alligator Bayou project without regard to union affiliation, employing persons solely on the basis of its own need for the applicant's occupational skills. Cross did not have a collective bargaining agreement with any labor union, and when this incident occurred no union was seeking to organize the company's employees. In addition, Cross often hired workers from outside the Port Arthur community.
 
 
 4
 Cross Construction Company's hiring practices provoked an antipathetic response from some segments of the Port Arthur community. In fact, on several occasions prior to the eruption of violence on January 17, popular enmity had risen to the level of warnings and threats directed against Cross and its employees. Local residents had confronted Cross employees at a local tavern and pool hall frequented by them, threatening to place pickets at the construction site, promising to make Cross "go union," and occasionally warning of trouble if Cross did not cease hiring nonunion laborers. About three months before the January 17 attack, one of the individual defendants, Bill Moore, approached Mr. Cross and threatened that he would "hurt you bad," saying, "What is going to happen when that big rig of yours down there burns up?" On another occasion, John Wallace, financial secretary and business representative for the Carpenters Local # 610, had told Cross that "this is union country" and that if he persisted in using nonunion labor it was "going to cost you a million dollars."
 
 
 5
 Meanwhile, during the months preceding the January 17 violence, rumors began to develop concerning a "citizens protest" to be staged at the Alligator Bayou construction site. These rumors contemplated a public demonstration to call attention to the fact that Cross hired nonunion labor and did not have a labor contract with any union as well as to protest the company's policy of hiring employees from outside the Port Arthur community.
 
 
 6
 There is no direct evidence to show the organizing force behind this protest demonstration, but on Wednesday, January 15, two days before the assault on the Cross jobsite, the Sabine Area Building Trades Council held its regular weekly meeting. Cross Construction Company's indifference to prospective employees' union status and its lack of a union contract had long been topics of concern at the Council's meetings, and they were once again discussed during the January 15 session. In addition, the group discussed the rumored citizens protest, and some of the union representatives in attendance informed the Council that the demonstration had apparently been scheduled for the following Friday.
 
 
 7
 On Thursday, the sixteenth, Cross Construction Company learned of the scheduled protest from two union employees associated with the Alligator Bayou project. Fred Dukes, a member of Cement Masons Local 884, worked for Cross as a cement finisher on a two-day job. Earl Stevens, a member of Plumbers Local 504, worked as a foreman for Cross Construction Company's mechanical subcontractor. Both men received warnings from their respective union business agents about a possible picket or demonstration to be held at the Cross construction site, and both men passed that information along to Cross. Neither Dukes nor Stevens had heard anything about violent or destructive conduct. Nevertheless, Cross directed its employees to report for work at 6:00 a. m. on Friday, an hour earlier than usual, in order to avoid any confrontation between them and the demonstrators.
 
 
 8
 On the morning of January 17, after most of the Cross employees had arrived at work, a crowd of nearly three hundred people assembled at the main access road leading to the Cross construction site. Several vehicles made brief forays up the access road, and their occupants confirmed with Cross and Scott that they were at the Cross Construction Company jobsite. The crowd began to get unruly, pushing and shoving the remaining Cross workers as they arrived. Nevertheless, Cross's employees began work as usual. Then, shortly after 7:00 that morning, a group of four pickup trucks, each carrying between twelve and eighteen persons, emerged from the crowd gathered at the access road and drove onto the jobsite. Plaintiff Scott went out to meet the intruders and to request them to leave the area, but one of them approached Scott and said, "Man, you all have got to be crazy ... this is a union town." Scott told his interlocutor that they did not want any trouble, and he attempted to gather together the other employees and to leave the jobsite. However, before he could complete his mission, someone stepped out of the group and struck him on the head. Suddenly, the mob swarmed over the construction site, brutally beating Cross and his employees with iron rods and wooden boards, overturning and setting fire to the trailer that served as the construction site office, smashing automobile and truck windshields, and vandalizing company tools and equipment. The entire episode lasted only a few minutes, but the destruction was devastating. Cross and his employees were treated for their injuries at a local hospital, and work at the construction site did not resume for nearly three weeks. Some of Cross's employees, frightened by the possibility of repeated attacks at the jobsite, refused to return to work. In addition, the violence and vandalism delayed the completion of the project by about six months, ultimately causing the Cross Construction Company to default in its contractual obligation to the U.S. Army Corps of Engineers.
 
 
 9
 On January 31, 1975, plaintiffs Scott and Matthews initiated this lawsuit against the individual defendants. They sought and obtained a temporary injunction restraining the then-named defendants and "all persons, firms, and associations combining or conspiring with defendants" from further violent, intimidating, or destructive acts against employees at the Alligator Bayou Pump Station project. Nearly two years later, the plaintiffs amended their complaint, adding A.A. Cross Construction Company, Inc., as plaintiff and the Sabine Area Building and Construction Trades Council along with twenty-five local unions as defendants. The district court found that the plaintiffs had proved a conspiracy to deprive them of the equal protection of the laws, permanently enjoined the building trades council and twenty-four of the unions from future misconduct, and assessed damages against eleven of the union defendants.[1]
 
 
 10
 II. THE JURISDICTIONAL QUESTION: INJUNCTIVE RELIEF AND THE
 
 NORRIS- LAGUARDIA ACT
 
 11
 The district court issued a permanent injunction against the Sabine Area Building and Construction Trades Council, twenty-four of its member unions, and all persons conspiring with them. The court's injunction ordered that those parties subject to its terms
 
 
 12
 ... shall not hereafter combine, conspire, threaten, intimidate, assault, or commit any act of violence toward or upon any person, property or possession of any person or his family who may work upon, travel to, deliver materials, goods, or services to A.A. Cross Construction Co., Inc., or to the site of the Alligator Bayou Pump Station on Taylor's Bayou near Port Arthur, Jefferson County, Texas.
 
 
 13
 The defendants contest the district court's power to issue such an injunction, arguing that the Norris-LaGuardia Act deprives the district court of jurisdiction to enjoin labor organizations from engaging in conspiratorial conduct. They maintain that the unembellished language of the Act is sufficient to show the court's usurpation of authority.
 
 
 14
 We disagree. The Norris-LaGuardia Act was passed for the purpose of limiting the circumstances and conditions under which injunctive action could be taken against labor organizations in the context of a labor dispute. The labor injunction had been an important device used by employers to counter organized labor's most effective economic weapons, strikes, boycotts, and picket lines. However, the Act was predicated on the conviction that labor disputes turned on issues of social and economic policy that could not appropriately be resolved by the courts. The legislative solution to the problems confronting workers in a complex industrial economy was union organization and collective bargaining. Since the ready issuance of labor injunctions presented a serious obstacle to the concerted activities of organized workers, Congress decided to remove the federal judiciary from labor disputes. Thus, section 5 of the Act, 29 U.S.C. § 105, limits the equitable power of the federal courts in the following way:
 
 
 15
 No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title.
 
 
 16
 29 U.S.C. § 105.
 
 
 17
 But the Act does not impose an unqualified prohibition against federal injunctive relief. Section 105 merely restricts the court's power to enjoin concerted or conspiratorial activity where the conduct to be enjoined is an act enumerated in section 104.[2] The enumerated acts include refusing to work, joining a labor organization, paying or withholding strike benefits from a labor disputant, lawfully giving aid to a labor disputant who is prosecuting or defending a court action, truthfully and peacefully publicizing a labor dispute, peaceably assembling to promote one's interests in a labor dispute, and agreeing with or inducing other persons to do any of those acts. In short, section 104 interdicts injunctive relief against legitimate activities of labor unions. Nothing in this provision, however, denies to federal courts the power to enjoin violence, breaches of the peace, or criminal acts simply because they may be committed by persons seeking to forward or interested in some labor-related objective.
 
 
 18
 In fact, the Norris-LaGuardia Act itself recognizes by negation the threatened commission of violent acts as a condition under which an injunction may issue: Section 107 states that no court of the United States has jurisdiction to grant an injunction, unless, after a hearing, the court finds "(t)hat unlawful acts have been threatened and will be committed unless restrained...." 29 U.S.C. § 107(a). Thus, violence, intimidation, threats, vandalism and combinations or conspiracies to commit such acts may be restrained and enjoined even though they arise in connection with a labor dispute. See, e.g., Westinghouse Broadcasting Co. v. Dukakis, 412 F.Supp. 580 (D.Mass.1976); Potomac Electric Power Co. v. Congress of Racial Equality, 209 F.Supp. 559 (D.D.C.1962). The Norris-LaGuardia Act does not divest the district court of jurisdiction to enjoin the kind of violent conduct present in this case.[3]
 
 
 19
 III. THE STATUTORY QUESTION: THE SCOPE OF REMEDY UNDER 42
 
 U.S.C. § 1985(3)
 A. Griffin v. Breckenridge
 
 20
 Section 1985(3) was originally enacted by Congress as a part of the Ku Klux Klan Act in order to enforce the Civil War amendments to the Constitution and to provide a means of redress for persons victimized by the Klan's acts of terror and intimidation. The statute imposes civil liability on persons conspiring to deprive another person or class of persons of "the equal protection of the laws, or of equal privileges and immunities under the laws."[4] Narrow judicial construction made section 1985(3) a seldom-used remedy during the first century after its enactment. See, e.g., Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). However, the Supreme Court decided in 1971 to "accord to the words of the statute their apparent meaning" and held section 1985(3) provided a civil remedy for damages against wholly private infringements of constitutionally protected rights. Griffin v. Breckenridge, 403 U.S. 88, 97, 91 S.Ct. 1790, 1795, 29 L.Ed.2d 338, 345 (1971). In Griffin, a group of whites assaulted three black men along a Mississippi highway in the mistaken belief that their victims were the associates of a civil rights worker. The blacks brought an action under section 1985(3) to redress violations of the laws of the United States and of Mississippi, including the rights of free speech, assembly, association, interstate travel, liberty, and security of their persons. The Supreme Court first held that the text of the statute, recent judicial interpretations given to related civil rights provisions, the complementary relationship of the various civil rights statutes, and the legislative history surrounding section 1985(3) all "point unwaveringly to § 1985(3)'s coverage of private conspiracies." 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347.
 
 
 21
 While eliminating the state action requirement, the Griffin court recognized that the statute, if applied too broadly, could displace many areas of tort law that have traditionally been reserved to the states and thereby violate constitutionally based principles of federalism. "That the statute was meant to reach private action does not ... mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347. The Court delineated the reach of the statute by giving full effect to a limiting amendment drafted by Congress. The Court construed the language of the amendment, which limited section 1985(3)'s application to deprivations of equal protection or equal privileges and immunities, to require that there be some "class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. at 102, 91 S.Ct. at 1798. Griffin thus made clear that the limiting principle adopted by Congress is satisfied by a showing of class-based animus. The Court then noted four elements necessary for a plaintiff to establish a 1985(3) cause of action:
 
 
 22
 (1) the defendants must conspire or go in disguise on the highway or premises of another;
 
 
 23
 (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and
 
 
 24
 (3) one or more of the conspirators must commit some act in furtherance of the conspiracy; whereby
 
 
 25
 (4) another is either (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States.
 
 
 26
 See id. at 102-03, 91 S.Ct. at 1790, 29 L.Ed.2d at 348. Subsequently, this court has added a fifth element,
 
 
 27
 (5) that the conspirators' conduct must be unlawful independent of the section 1985(3) violation.
 
 
 28
 See McLellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir. 1977) (en banc).
 
 
 29
 The Griffin court, having concluded that the plaintiffs had stated a cause of action under section 1985(3), then sought to locate a source of congressional power to reach the private conspiracy alleged. The sources identified in Griffin were the Thirteenth Amendment and the constitutional right to travel. 403 U.S. at 104-06, 91 S.Ct. at 1799-1800, 29 L.Ed.2d at 349-50. The Court observed, however, that other provisions of the Constitution, including section 5 of the Fourteenth Amendment, might empower Congress to reach other conspiracies by private persons. Id. at 107, 91 S.Ct. at 1801, 29 L.Ed.2d at 351. However, the Court found the facts of that case made it unnecessary to look beyond the Thirteenth Amendment and the right to interstate travel.
 
 B. The Present Case
 
 30
 Griffin's principles indicate the plaintiffs here have made out a cause of action under section 1985(3). The facts of this case clearly embody four of the five elements essential to a successful 1985(3) claim. First, the evidence is sufficient to establish a conspiracy among some of the Council's constituent unions and individual defendants. Second, proof that plaintiffs were assaulted, beaten, and threatened and that property was destroyed establishes the requisite "act in furtherance" of the conspiracy. Third, these acts are indisputably illegal apart from § 1983(3) as required by McLellan. Fourth, there is evidence of personal injuries, property damage, and economic loss. The only element requiring analysis is the requirement that the conspiracy be for the purpose of depriving a person of the equal protection of the laws or equal privileges and immunities under the laws. This requirement, in turn, has two components: (1) the violation of some protected right and (2) a class-based, invidiously discriminatory animus motivating the violation.
 
 1. Violation of a Protected Right
 
 31
 In Griffin, the Supreme Court stated that a 1985(3) conspiracy "must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. The plaintiffs in the case at bar contend that the object of the defendants' conspiracy was to deprive them of their First Amendment right to associate with their fellow nonunion employees. They argue that curtailment of their interests secured by the First Amendment is a deprivation of equal protection of the laws within the meaning of section 1985(3) as interpreted by Griffin.
 
 
 32
 The Ku Klux Klan Act was originally entitled, "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes." 17 Stat. 13 (1871). The guaranties afforded by the First Amendment are protected by the due process clause of the Fourteenth Amendment. E.g., Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968); New York Times v. Sullivan, 376 U.S. 254, 276-77, 84 S.Ct. 710, 724, 11 L.Ed.2d 686, 709 (1964); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217 (1940); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L.Ed. 278, 283 (1937). Moreover, the right of free association is closely aligned with the right of free speech and is similarly protected by the First Amendment. E.g., Abood v. Detroit Board of Education, 431 U.S. 209, 233, 97 S.Ct. 1782, 1798-99, 52 L.Ed.2d 261, 283 (1977); Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972); Baird v. State Bar of Arizona, 401 U.S. 1, 6, 91 S.Ct. 702, 705, 27 L.Ed.2d 639, 646 (1971); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171-72, 2 L.Ed.2d 1488, 1499 (1958).
 
 
 33
 The defendants raise two objections to the plaintiffs' assertion of a protected right. First, they contend that section 1985(3) does not provide a remedy for private interference with First Amendment freedoms. Second, they argue that even if such a remedy does exist, the plaintiff's activities did not rise to the level of a constitutionally protected right.
 
 
 34
 In arguing that section 1985(3) does not protect against private infringement on First Amendment freedoms, the defendants note the well-established principle that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 1180 (1948). To support their construction of section 1985(3) the defendants rely upon several decisions of the Seventh Circuit. In Dombrowski v. Dowling, 459 F.2d 190 (7th Cir. 1972), the court held that section 1985(3) does not afford protection against private deprivations of rights protected under the Fourteenth Amendment absent some kind of state involvement. Emphasizing the historical connection between sections 1983 and 1985(3), Dowling decided that it is necessary to identify the interests which Congress intended to protect from unequal treatment as well as the kinds of conduct which it meant to proscribe.
 
 
 35
 The breadth of the statute's coverage is yet to be determined, but three categories of protected rights have been plainly identified. Griffin gives express recognition to a black citizen's Thirteenth Amendment rights and to his federal right to travel interstate; the title of the statute expressly identifies the third category, namely, rights protected by the Fourteenth Amendment. We think the § 1983 cases make it clear that in this third category a "state involvement" requirement must survive Griffin.
 
 
 36
 459 F.2d at 195 (footnotes omitted).[5] The Seventh Circuit subsequently extended the Dowling rationale in Murphy v. Mount Carmel High School, 543 F.2d 1189 (7th Cir. 1976), expressly holding that section 1985(3) provides no remedy for purely private impairment of First Amendment speech and associational freedoms. Accord Bellamy v. Mason's Stores, Inc., 508 F.2d 504 (4th Cir. 1974).
 
 
 37
 To explain how private conspirators could deprive a person of rights which are only protected against state interference, Justice Stevens, the author of Dowling, later suggested that "if private persons take conspiratorial action that prevents or hinders the constituted authorities of any State from giving or securing equal treatment, the private persons would cause those authorities to violate the Fourteenth Amendment." See Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366, 384, 99 S.Ct. 2345, 2355, 60 L.Ed.2d 957 (1979) (Stevens, J. concurring).
 
 
 38
 Our problem with this line of analysis arises from the Supreme Court's express reasoning in Griffin. Because most basic constitutional provisions impose limitations on the power of government to regulate private conduct, the rights these limitations confer on individuals are typically rights against the state. The Griffin Court acknowledged the conceptual difficulties associated with private deprivations of constitutional rights. The Court, however, construed section 1985(3) to reach both public and private constitutional wrongs.
 
 
 39
 A century of Fourteenth Amendment adjudication has ... made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State. Indeed, the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985(3) of all deprivations of "equal protection of the laws" and "equal privileges and immunities under the laws," whatever their source.
 
 
 40
 403 U.S. at 97, 91 S.Ct. at 1796, 29 L.Ed.2d at 345 (citation omitted and some emphasis supplied). The Court also said: "It is thus evident that all indicators-text, companion provisions, and legislative history-point unwaveringly to § 1985(3)'s coverage of private conspiracies." Id. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347.[6] These clear, decisional words in Griffin simply will not permit us to speculate that section 1985(3) might not afford a remedy for private conspiracies.
 
 
 41
 Griffin even considered and rejected the very explanation of section 1985(3) which was later suggested in the Novotny concurrence. In concluding that the first part of section 1985(3) reached all deprivations of the equal protection of the law, "whatever their source," Griffin considered the various forms which a state action limitation might take but rejected the idea that Congress had intended to impose any state action limitation on section 1985(3). Specifically, the Court rejected the notion that a private conspiracy had to hinder state officials in their obligation to give equal protection because it found that this type of conduct was explicitly dealt with elsewhere in the Act. See Griffin v. Breckenridge, 403 U.S. at 98-99, 91 S.Ct. at 1796-97.
 
 
 42
 We are not unmindful of the Supreme Court's statement in Novotny, that section 1985(3) "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." 442 U.S. at 372, 99 S.Ct. at 2349. We also acknowledge that some commentators have read this statement as an implicit endorsement of the Seventh Circuit's position in Dowling. See Note, Private Conspiracies to Violate Civil Rights, 61 B.U.L.Rev. 1007 (1981). However, so long as Griffin remains viable, we are bound by its determination that section 1985(3) reaches all deprivations of equal protection, whatever their source.
 
 
 43
 The second prong of defendants' argument on this point asserts that even if section 1985(3) protects first amendment rights from private infringement, the plaintiffs' actions in this case-merely working for a nonunion employer-do not qualify for constitutional protection. We disagree.
 
 
 44
 The Supreme Court has long recognized that association for the purpose of advancing economic, as well as political or religious, interests falls within the protection of the First Amendment. See Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 8, 84 S.Ct. 1113, 1117-18, 12 L.Ed.2d 89 (1964); Thomas v. Collins, 323 U.S. 516, 531, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). In Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court recognized that the corollary of the right to associate to advance economic interests is the right not to associate. Abood stated that "(t)o compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests." 431 U.S. at 222, 97 S.Ct. at 1793. The Court reasoned that because the employees' forced support would entail the advancement of interests and ideas which they did not share, the employees' right not to associate could be infringed by union shop laws. Moreover, the Court pointed out that union shop laws had been upheld previously, not because employees lack a First Amendment right not to associate, but because "such interference (with that right) as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." Id. Though it found such infringement justified, Abood thus recognized that requiring financial support could infringe first amendment rights.
 
 
 45
 The conspiracy in the case at bar sought to deny completely the plaintiff employees' right not to associate. The district court found that several truckloads of men assaulted the plaintiffs and "threatened to continue violent actions if the nonunion workers did not leave the area or concede to union policies and principles." The conspiracy was intended to deny the nonunion employees their right not to associate either by driving them out of the county or by coercing them to unionism through violence. The defendants sought not merely to force plaintiffs to give financial support to a union (an act which Abood recognized could interfere with a person's freedom not to associate), but also to force Cross's employees to become union members or leave an area which had been staked out as "union country." The purpose of the conspiracy was to deprive the plaintiffs of a protected right.[7]
 
 2. Discriminatory, Class-Based Animus
 
 46
 While Griffin made clear that Congress intended to reach a denial of equal protection because of race, it left open the issue of whether section 1985(3) prohibited other class-based discrimination. See 403 U.S. at 102 n.9, 91 S.Ct. 1798 n.9. We find it does and that plaintiffs come within its protection.
 
 
 47
 In Kimble v. D. J. McDuffy, Inc., 648 F.2d 340 (5th Cir. 1981) (en banc), we recently considered what other types of class-based animus section 1985(3) might reach. We found that two types of classes come within the statute's protection. First, we recognized that section 1985(3) covers classes "having common characteristics of an inherent nature"-i.e., those kinds of classes offered special protection under the equal protection clause. Id. at 347. We also recognized that:
 
 
 48
 (t)he class-based animus required by the Supreme Court in Griffin and now reasserted by this court is not identical with the class-based distinctions required to support an action under the equal protection clause .... For example, section 1985 was certainly intended to cover conspiracies against Republicans; distinctions based on affiliation with a major political party are not among those traditionally subject to special scrutiny under the Fourteenth Amendment. What Griffin stands for, and what we now hold, is that Section 1985 was intended to encompass only those conspiracies motivated by animus against the kinds of classes Congress was trying to protect when it enacted the Ku Klux Klan Act.
 
 
 49
 Id. at 347 n.9.
 
 
 50
 Kimble is consistent with the decisions of the other circuits. Decisions which have accorded protection to nonracial classes have generally fallen into the two categories identified by Kimble. The first category consists of those classes afforded special protection under the equal protection clause. See, e.g., Ward v. Connor, 657 F.2d 45 (4th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982) (members of Unification Church); Life Insurance Company of North America v. Reichardt, 591 F.2d 499 (9th Cir. 1979) (women); Marlowe v. Fisher Body, 489 F.2d 1057 (6th Cir. 1973) (Jews); Baer v. Baer, 450 F.Supp. 481 (N.D.Cal.1978) (members of the Unification Church); Mandelkorn v. Patrick, 359 F.Supp. 692 (D.D.C.1973) (Children of God). The second is made up of classes whose members are discriminated against because of their political beliefs or associations. See, e.g., Means v. Wilson, 522 F.2d 833 (8th Cir. 1975), cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (supporters of a particular political candidate); Glasson v. City of Louisville, 518 F.2d 899 (6th Cir.), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (political demonstrators); Smith v. Cherry, 489 F.2d 1098 (7th Cir. 1973), cert. denied, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (voters for a sham political candidate); Cameron v. Brock, 473 F.2d 608 (6th Cir. 1973) (supporters of incumbent sheriff); Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971) (worshippers at a predominantly white Catholic church disrupted by black civil rights protesters).
 
 
 51
 Plaintiffs are not a class normally afforded special protection under the equal protection clause merely because they wish to work nonunion. They are entitled to section 1985(3) protection only if they are persons within the second category of protected classes noted by Kimble, "the kind( ) of class Congress was trying to protect when it enacted the Ku Klux Klan Act." 648 F.2d at 347 n.9. In considering whether plaintiffs qualify, we must from the outset be mindful that the conspiracy in this case was motivated by a prounion animus so strong that it staked its claim not merely ideologically, but geographically. The nonunion plaintiffs were repeatedly told that they were in union country and would be punished for choosing to work there nonunion.
 
 
 52
 Not every conceivable class of persons is covered by section 1985(3). Members of the plaintiff class must share some common characteristic beyond simply being victims of the defendant's conspiratorial conduct. See, e.g., Askew v. Bloemker, 548 F.2d 673 (7th Cir. 1976) (homeowners raided by drug enforcement agents); Harrison v. Brooks, 519 F.2d 1358 (1st Cir. 1975) (property owners allegedly injured by city council rezoning efforts). The class cannot be so large and amorphous that its members are virtually indistinguishable from the vast majority of the populace. See, e.g., Blevins v. Ford, 572 F.2d 1336 (9th Cir. 1978) (nonlawyers). Even some clearly defined and easily identifiable groups have been denied protected status under the statute. See, e.g., DeSantis v. Pacific Tel. & Tel. Co., 608 F.2d 327 (9th Cir. 1979) (homosexuals); Carchman v. Korman Corp., 594 F.2d 354 (3d Cir. 1979), cert. denied, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979) (tenant organizers); Lessman v. McCormick, 591 F.2d 605 (10th Cir. 1979) (debtors); McLellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir. 1977) (en banc) (persons who file voluntary bankruptcy petitions); Bricker v. Crane, 468 F.2d 1228 (1st Cir. 1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973) (physicians who testify in malpractice suits).
 
 
 53
 In the absence of Supreme Court guidance as to the kinds of classes protected by section 1985(3) or a method by which protected classes should be identified, we turn to our own en banc decision in McLellan to provide our gauge. In McLellan, we held that the statute does not cover persons who file voluntary petitions in bankruptcy. The decision was based on three factors. First, the legislative history of the Ku Klux Klan Act contains no evidence of congressional concern about discrimination against persons who become insolvent. Second, while the protection afforded by the civil rights acts is not static, it would be inappropriate to enlarge the group of protected classes to include bankrupts when Congress had specifically declined to prohibit discrimination against them. Third, including bankrupts within the ambit of section 1985(3) would be unwarranted in light of the Supreme Court's refusal to characterize the right to file a bankruptcy petition as a fundamental right. 545 F.2d at 932-33. While the presence of the first factor indicates that a particular class should come under the aegis of section 1985(3), the last two factors act more as checks on unwarranted expansion of section 1985(3). Their presence does not suggest so much that a particular class should be protected as their absence indicates that coverage would be inappropriate.
 
 
 54
 Applying the McLellan factors to our case today, we find that the plaintiffs constitute a class for 1985(3) purposes.[8] The labor union movement in America was yet to be born when the 42d Congress was in session, so it could not have been specifically concerned with discrimination perpetrated against nonunion laborers. However, the congressional debates evince a hearty regard for persons who are victimized because of their political beliefs and associations. Today's Ku Klux Klan proclaims itself to be a racist organization. But in 1871 it was regarded primarily as a political one. The motives and ambitions of the Klan disturbed the Republicans in the 42d Congress because they feared that its activities would defeat the policies of Reconstruction and deprive the newly emancipated blacks of rights secured to them under the recent amendments to the Constitution. Senator John Sherman of Ohio voiced this concern after he read aloud from a copy of the Klan's secret oath,
 
 
 55
 showing that here is a political organization, with political ends, political aims; it shows that the object and intent of that political organization is to prevent large masses of the people of the southern States from enjoying a right which has been guaranteed to them by the Constitution of our country.
 
 
 56
 Cong. Globe, 42d Cong., 1st Sess. 153 (1971). The Klan's political objective formed a recurrent theme in the Senate debates.[9]
 
 
 57
 The apprehension of Republican senators over the Klan's scheme of terrorizing citizens for their political views and of preventing voters from exercising their franchise also echoed throughout the debates conducted in the House. Representative Ellis Roberts of New York expressed this concern in the following terms:
 
 
 58
 But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white; they include those who wore the blue and those who wore the gray; newcomers and life-long residents, but only Republicans. Stain the door lintels with the mark of opposition to reconstruction and of hostility to the national Administration and the destroying angel passes by. Omit that sign and the torch may kindle the roof that covers women and children.... Such uniformity of result can come only from design. Republicans only are beaten and mutilated and murdered, because the blows are aimed at Republicans only.
 
 
 59
 Cong. Globe, 42d Cong., 1st Sess. 412-13 (1871). Other Republican congressmen expressed similar views.[10] See generally Comment, A Construction of Section 1985(c) in Light of its Original Purpose, 46 U.Chi.L.Rev. 402, 407-420 (1979).
 
 
 60
 These attacks on Republicans prompted congressional concern because they were viewed as more than isolated or chance occurrences. Congress saw them as part of a pervasive campaign to prevent Republicans from establishing the policies of Reconstruction in an area of the nation-the South. See Avins, The Ku Klux Klan Act of 1871, 11 St. Louis U.L.J. 331, 376 (1967). The Congressmen consistently noted the pervasive regional hostility toward the Republicans as a reason for extending federal protection in section 1985(3). See, e.g., Cong. Globe, 42d Cong., 1st Sess. 333-34 (1871) (remarks of Rep. Hoar); id. at 412-13 (remarks of Rep. Roberts.)[11]
 
 
 61
 Although Congress did not express a specific intent to protect nonunion employees in enacting the Ku Klux Klan Act, the legislative history demonstrates that the nonunion employees in this case comprised the kind of class Congress intended to protect. The debates over the need for protecting the Republicans in the South reveal two class characteristics which prompted Congress to extend protection in section 1985(3). First, the legislative history reflects a pervasive concern for people discriminated against because of their political associations. Second, Congress' concern was prompted by the tenuous status of Republicans in this geographic region. The Republicans' attempt to establish an extended new order had met with pervasive regional hostility. It was this regional hostility which Congress sought to counterbalance by extending federal protection in section 1985(3). Although regional hostility is not an intrinsic class characteristic, those who would exercise a false territorial sovereignty by fomenting hostility against persons antagonistic to their aims create a class in need of federal protection of precisely the sort Congress intended to protect.
 
 
 62
 In this case, the plaintiffs were attacked because of their economic, rather than their political, association. However, an animus directed against nonunion association is closely akin to animus directed against political association. Second, the position of these nonunion employees in Jefferson County, Texas, is markedly similar to that of the Republicans in the South. The presence of these nonunion employees in "union country," no less than the presence of the Republicans in the previously Democratic stronghold, ignited a pervasive regional hostility. It was this regional hostility which classified Republicans as protected. In this case, the same hostility toward nonunion employees classifies them as the kind of persons Congress intended the Ku Klux Klan Act to protect.
 
 
 63
 Similarly, acknowledging that the scope of the statute includes nonunion workers who are attacked for their choice to associate with other nonunion workers, thereby enabling an employer to offer significant work to the class, is appropriate in light of subsequently enacted federal legislation. While Congress specifically refused to prohibit discrimination against bankrupts by legislation, it expressed a desire to protect laborers who opt not to affiliate themselves with a labor organization. Section 7 of the original Wagner Act provided
 
 
 64
 (e)mployees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.
 
 
 65
 Wagner Act, § 7, 49 Stat. 452 (1935).
 
 
 66
 At the time Congress passed the original Act, it rejected the argument that parity required granting protection against coercive tactics of labor organizations as well as against those committed by employers. See S.Rep. 573, 74th Cong., 1st Sess. 16 (1935). However, significant change was not long in coming. The 1947 Taft-Hartley amendments to the National Labor Relations Act put unfair labor practices by labor organizations in the list of condemned actions. Under the Taft-Hartley Act employees retained the right to form, join, or assist labor organizations. However, section 7 of the original Act was revised to also protect "the right to refrain from any or all such activities." Taft-Hartley Act, § 101, 61 Stat. 140 (1947), currently codified at 29 U.S.C. § 157. Section 8(b)(1) now declares it to be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of the rights guaranteed by section 7. 29 U.S.C. § 158(b)(1). By these actions Congress has underscored the importance of the right of free association in the labor relations context and guaranteed the right to free and untrammeled choice to associate or not to associate with a labor organization. This manifestation of congressional concern for those in plaintiffs' class makes their protection by section 1985(3) particularly appropriate.
 
 
 67
 Finally, McLellan regarded the Supreme Court's refusal to call the right to file a bankruptcy petition a fundamental right as relevant to its own determination that bankrupts are not protected by section 1985(3). By contrast, the Supreme Court has characterized the right of free association as "a right which, like free speech, lies at the foundation of a free society." Shelton v. Tucker, 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, 236 (1960). Our legal system honors the freedom of the individual to associate as he chooses because that freedom "tends to produce the diversity of opinion that oils the machinery of democratic government and insures peaceful, orderly change." Gilmore v. City of Montgomery, 417 U.S. 556, 577, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304, 321 (1974). The importance of the freedom of association has led the court to call it one of the "indispensable liberties," NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1499 (1958), which ranks "among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968). The right of association is fundamental in our constitutional scheme of values. Thus, the difference in importance assigned to the right to file a bankruptcy petition and the right of the individual to freely associate with others of his own choosing favors protecting these plaintiffs.
 
 
 68
 Although we find that Congress intended to classify these nonunion employees as entitled to use section 1985(3) that finding does not resolve the question of whether their employer, which is not a member of the class, can assert a claim under this section. Section 1985(3) provides that "in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy whereby another is injured in his person or property, ... the party so injured ... may have an action for the recovery of such damages, occasioned by such injury...." The language of section 1985(3) specifically provides a remedy for any person injured by an act taken in furtherance of the conspiracy. See Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366, 390-91, 99 S.Ct. 2345, 2358, 60 L.Ed.2d 957 (1979) (White, J., dissenting) (reaching an issue not addressed by the majority). But see Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 712 (9th Cir. 1981).
 
 
 69
 The district court found that Cross Construction had been injured by the attack on its Alligator Bayou worksite. There is no dispute as to the fact of the corporation's injury or that it resulted from the defendants' acts in furtherance of the conspiracy. The plain language of the statute grants the employer a right to recover for these injuries. Cf. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).
 
 
 70
 The plaintiff, Cross Construction Company, was denied the equal protection of law because, in this "union country" area, it attempted to construct a government project without entering into a collective bargaining agreement to hire nonunion workers. The plaintiff class of Cross employees were denied equal protection because they dared to try to work nonunion in this place. Both employer and employee plaintiffs were attacked and beaten and their property was destroyed because union adherents put themselves above the law and used brute force to enforce their territorial claim. The actions of plaintiffs and the reaction of defendants joined to define the class and designate the persons who could claim the protection of section 1985(3). The plaintiff employees form a class of nonunion workers who have a right not to belong to a union and the plaintiff employer is a person who has been injured by a class-based invidiously discriminatory animus directed toward its workers and it.
 
 
 71
 Our decision does not hold or imply that every union-nonunion controversy can create a section 1985(3) cause of action. Neither does it hold or imply that every instance of violence arising in the context of a dispute about employment will necessarily do so. Powerful limitations exist to restrict an overly broad application of the statute. See generally McLellan, 545 F.2d at 940-41 (Godbold, J., dissenting). Section 1985(3) cannot be invoked to disrupt the operation of a carefully integrated statutory scheme. See Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).[12] Neither can a section 1985(3) cause of action be predicated upon an unfair labor practice, without more. Cf. United States v. DeLaurentis, 491 F.2d 208 (2d Cir. 1974) (holding an unfair labor practice not cognizable under 18 U.S.C. § 241, the criminal analogue to section 1985(3)). Neither unionism nor nonunionism suffices to create a covered class. But where, as here, there is no campaign to organize employees and force or violence is used to stake out one group's territorial claim and to deprive other workers and their employer of the right to freely associate with one another, a section 1985(3) action will lie.[13]
 
 
 72
 IV. THE CONSTITUTIONAL QUESTION: THE SOURCE OF CONGRESSIONAL POWER
 
 
 73
 Having determined that section 1985(3) was intended to provide a civil remedy for the kind of conspiracy involved here, we must respond to defendants' argument that Congress lacks the constitutional power to enact legislation of this breadth. The plaintiffs maintain that section 5 of the Fourteenth Amendment authorizes Congress to provide a civil remedy for this private conspiracy. On the particular facts before us, we hold that the Commerce Clause empowers Congress to reach defendants' conduct and do not reach the Fourteenth Amendment issue.
 
 
 74
 Griffin emphasized that it was unnecessary to test the constitutionality of section 1985(3) in all conceivable applications in order to sustain its facial constitutionality and its application to the facts of any particular case. 403 U.S. at 105, 91 S.Ct. at 1799, 29 L.Ed.2d at 350. Griffin also makes clear that section 1985(3) is not unconstitutional merely because it reaches wholly private conspiracies. Griffin does, however, indicate that a source of congressional power must be identified to warrant application of the statute in each case.
 
 
 75
 The Griffin court concluded that the Thirteenth Amendment and the constitutional right to interstate travel authorized Congress to reach the private conspiracy alleged there. But the court concluded its opinion, stating
 
 
 76
 In identifying these two constitutional sources of congressional power, we do not imply the absence of any other. More specifically, the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment.
 
 
 77
 Id. at 107, 91 S.Ct. at 1801, 29 L.Ed.2d at 351.
 
 
 78
 The plaintiffs' 1985(3) action cannot be sustained under the Thirteenth Amendment, for they are neither a racially oppressed group nor suffering in the bonds of involuntary servitude. See, e.g., Jones v. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Clyatt v. United States, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726 (1905). Neither can it be supported by the right to travel on the present record. Although the plaintiffs alleged that the object of the defendants' conspiracy was to deprive them of the right to interstate travel, they have introduced no evidence to show that either the purpose or the result of the conspirators' acts was to infringe upon their right to such travel.
 
 
 79
 However, the alternative path suggested by Griffin is itself fraught with uncertainty. A major controversy still exists over the extent to which section 5 of the Fourteenth Amendment grants Congress the power to reach wholly private conduct. Particularly, whether section 1985(3) can be constitutionally applied to private, nonracially motivated conspiracies is a question which has divided the circuits. Compare Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971) and Richardson v. Miller, 446 F.2d 1247 (3d Cir. 1971) (holding that the Fourteenth Amendment authorizes Congress to reach purely private conduct) with Murphy v. Mount Carmel High School, 543 F.2d 1189 (7th Cir. 1976) (finding that it does not). Furthermore, no single interpretation of the expanse of Congress's power under section 5 has consistently commanded the adherence of a majority of the Supreme Court. Compare United States v. Guest, 383 U.S. 745, 762, 86 S.Ct. 1170, 1180, 16 L.Ed.2d 239, 251 (1966) (Clark, J., concurring, joined by Black and Fortas, J.J.) and id. at 782, 86 S.Ct. at 1190, 16 L.Ed.2d at 263 (Brennan, J., concurring and dissenting, joined by Warren, C. J. and Douglas, J.) (suggesting that § 5 empowers Congress to punish purely private conspiracies to deprive Fourteenth Amendment rights), with, id. at 753-60, 86 S.Ct. at 1175-80, 16 L.Ed.2d at 246-50 (opinion of the Court by Stewart, J., relying on right to interstate travel) and id. at 762, 86 S.Ct. at 1180, 16 L.Ed.2d at 251 (Harlan, J., concurring and dissenting). See Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).
 
 
 80
 We need not depend on this uncertain precedent for congressional power. Griffin clearly contemplated that other sources of congressional power might be available to justify other applications of section 1985(3). Indeed, the original proponents of the Ku Klux Klan Act did not base their assertion of congressional power exclusively on the Fourteenth Amendment. See, e.g., Cong. Globe, 42d Cong., 1st Sess. 81 (1871) (remarks of Rep. Bingham) ("It was always competent for the Congress of the United States by law to enforce every affirmative grant of power...."); id. at 477-78 (remarks of Rep. Shellabarger) (referring to the amendment to § 2 "so far as it is not confined to infractions of rights which are clearly independent of the Fourteenth Amendment, referable to and sustained by the old provisions of the Constitution"). On the facts presented in this case, we hold Congress has the authority to reach a wholly private conspiracy under the commerce power conferred by article I, section 8 of the Constitution.
 
 
 81
 A.A. Cross Construction Company is a general contractor in the building and construction industry. The record indicates that during the year preceding the violent episode of January 17, 1975, Cross had performed work outside of Texas valued in excess of $300,000. During that same period, Cross purchased goods and materials which originated outside of Texas, were used in its operations within Texas, and were valued at more than $50,000. In addition, at the time of the attack on the Alligator Bayou construction site, Cross was performing its obligations under a contract with the United States Army Corps of Engineers.
 
 
 82
 Article I, section 8, clause 3 of the Constitution confers upon Congress the power "(t)o regulate Commerce ... among the several states" and clause 18 of the same article grants it the power "(t)o make all laws which shall be necessary and proper for carrying into execution the foregoing powers...." As the Supreme Court has pointed out, this grant of power "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726, 732 (1942). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805, 811 (1949). See United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609, 619 (1941); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 911 (1937). Moreover, that the volume of goods and supplies purchased by Cross or that the volume of business done outside of Texas is comparatively small in terms of the total amount of goods moved or work performed in interstate commerce is not significant. Katzenbach v. McClung, 379 U.S. 294, 300-01, 85 S.Ct. 377, 382, 13 L.Ed.2d 290, 291 (1964); Wickard v. Filburn, 317 U.S. 111, 127-28, 63 S.Ct. 82, 90, 87 L.Ed. 122, 136 (1942). Judicial inquiry is limited to asking whether Congress had "a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce...." Katzenbach v. McClung, 379 U.S. at 304, 85 S.Ct. at 377, 13 L.Ed.2d at 298. And it is not constitutionally relevant that Congress was actually "legislating against moral wrongs" when it enacted the provisions in question. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257, 85 S.Ct. 348, 357, 13 L.Ed.2d 258, 268 (1946). Chief Justice Marshall's classic formulation of the extent of congressional power is still viable.
 
 
 83
 Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.
 
 
 84
 McCulloch v. Maryland, 4 Wheat 316, 421, 4 L.Ed. 579, 605 (1819).
 
 
 85
 By these standards, Congress acted within its constitutional power when it enacted section 1985(3) to reach the private conspiracy involved here. It cannot be denied that the aim of protecting interstate commerce from undue burdens is a legitimate end. Congress could reasonably have determined that violent attacks and vandalism perpetrated on the workers of a construction firm engaged in interstate commerce would have a disruptive effect on the flow of products and services among the states. It is also beyond dispute that the aim of protecting interstate workers in the exercise of their First Amendment associational freedoms is a legitimate end. The means adopted for the accomplishment of these ends, a private civil remedy for damages, is plainly reasonable and appropriate. Section 1985(3) as applied to the facts before us is not prohibited by the Constitution and is compatible with both its letter and its spirit. Whether section 1985(3) can constitutionally be applied to other kinds of wholly private conspiracies to deprive persons of their civil rights is a question for another day.V. THE EVIDENTIARY QUESTION: STANDARD OF PROOF AND
 
 SUFFICIENCY OF EVIDENCE
 A. The Standard of Proof
 
 86
 The unions contend that they cannot be held liable for unlawful acts committed at the Cross construction site by some individual members of their organizations without "clear proof" that they actually participated in the unlawful conduct, gave prior authorization of it, or ratified the acts after actual knowledge of their commission. This more rigorous standard of proof derives from section 6 of the Norris-LaGuardia Act which provides:
 
 
 87
 No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
 
 
 88
 29 U.S.C. § 106. This statutory standard of proof thus lies somewhere between the traditional burdens of reasonable doubt and preponderance of the evidence. With it, Congress intended to require "clear, unequivocal, and convincing proof" of union involvement in unlawful conduct to impose liability for it. United Mine Workers v. Gibbs, 383 U.S. 715, 737, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218, 234 (1966). Yet, while section 106 requires clear and convincing evidence as to union authorization, participation in, or ratification of the acts allegedly performed by its members, it does not prescribe a different standard of proof for other issues in actions against a union or its officers or members involved in a labor dispute. Ramsey v. United Mine Workers, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).
 
 
 89
 The unions also recognize that section 106 is by its own terms limited to cases in which the union is participating or interested in a labor dispute. The Norris-LaGuardia Act defines a "labor dispute" to encompass
 
 
 90
 any controversy concerning terms and conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, charging, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
 
 
 91
 29 U.S.C. § 113(c). The unions insist that the literal language of section 113(c) squarely covers the conduct at issue here. The persons who planned and executed the attack on the Alligator Bayou construction site were motivated by a desire to punish Cross for engaging in employment practices which violated their misperceived area of exclusive control and to punish those who would work for Cross without attorning to them. Because the conspiracy that generated the case was formed around this nonunion animus, the defendants maintain that the controversy out of which this case arose cannot be anything other than a labor dispute.
 
 
 92
 This approach has a certain superficial appeal. The attack on the Cross construction site was certainly conceived in reprisal for the refusal of Cross and his workers to accede to demands that the Alligator Pumping Station project be conducted as a union job. Nevertheless, in construing any congressional enactment it is necessary to interpret the meaning of the words as they are used in relation to the setting in which they were written, with due regard to the mischief which the legislation was designed to remedy. In that light, these unions were not participating in a "labor dispute" as that language is employed in section 113(c) because their activity does not fall within the abuses that Congress intended to prevent.
 
 
 93
 The Norris-LaGuardia Act was passed in a particular social, economic, and legal milieu. During the early part of this century, federal injunctive powers were often invoked to check the spread of union organization and collective bargaining. But Congress conceived that the courts were being made to play a partisan role in labor-management conflicts, in part because judicial injunctive relief usually did nothing to resolve the underlying industrial dispute. The Norris-LaGuardia Act was intended to curb this unwarranted judicial interference in the struggle between employers and employees. Instead, Congress decided to allow such controversies to be settled through negotiation and through the free play of economic forces.
 
 
 94
 The Norris-LaGuardia Act ... was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining.... Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.
 
 
 95
 Brotherhood of Railroad Trainmen v. Chicago River and Indiana Rd., 353 U.S. 30, 39, 77 S.Ct. 635, 640, 1 L.Ed.2d 622, 628 (1957). Thus, the policy section of the Act stresses the worker's "freedom of association, self-organization, and designation of representatives of his own choosing" as indispensable to the private settlement of these disputes. 29 U.S.C. § 102. Congress thereby made the use of legitimate economic weapons-the picket, the strike, the boycott-part of the warp and woof of our national labor relations policy. See generally Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 250-51, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199, 210 (1970); Milkwagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 100-03, 61 S.Ct. 122, 127-28, 85 L.Ed. 63, 68-70 (1940); A.Cox, D.Bok, & R.Gorman, Labor Law 60-64 (8th ed. 1977).
 
 
 96
 One of the special abuses identified by Congress was the use of vicarious liability doctrines under which the misconduct of a few individuals could be attributed to the labor organization that sponsored a strike or picket line. Courts had applied the common law of conspiracy to hold unions responsible not only for the conduct of their authorized agents, but also "for every act committed by any member of a union merely because he was a member, or because he had some relation in the union although not authorized by virtue of his position to act for the union in what he did." United Brotherhood of Carpenters and Joiners v. United States, 330 U.S. 395, 419, 67 S.Ct. 775, 788, 91 L.Ed. 973, 991 (1947) (Frankfurter, J., dissenting).
 
 
 97
 Congress recognized that this dragnet conspiracy approach to union responsibility could frustrate its chosen labor relations policy. Imposing liability on the union for the unauthorized lawlessness of its more improvident members would penalize the union lawfully engaged in using the legitimate economic weapons necessary for the proper resolution of labor-management conflicts. Therefore, Congress enacted section 106, requiring clear proof of union participation in, authorization, or ratification of unlawful conduct before liability could attach.
 
 
 98
 However, there is no danger of frustrating the congressional policy favoring collective bargaining and no risk of punishing union engagement in protected activity in the case before us. When the events giving rise to this case occurred, no union had a collective bargaining agreement with Cross, and none was seeking recognition as the collective bargaining representative for Cross's workers. No solicitation or other organizational efforts were in progress to attain representation of the Cross employees. No labor organization was engaged in informational picketing to publicize Cross's employment practices. In short, the attack on the Alligator Bayou construction project did not grow out of any legitimate union activity. The employer-employee relationship was not the matrix of the controversy.[14] The district court found: "the acts of violence ... are manifestations of the ill-will and hatred these union members harbor toward non-union individuals, as well as an attempt by the unions to intimidate and coerce these non-union people from working or being employed within a 'union area.' " This is not the kind of controversy contemplated by Congress when it required "clear proof" of misconduct by a union "participating or interested in a labor dispute."
 
 
 99
 On the other hand, a labor dispute does exist where unlawful conduct occurs in conjunction with some legitimate union activity. See, e.g., Cedar Crest Hats, Inc. v. United Hatters, Cap & Millinery Workers Int'l Union, 362 F.2d 322, 327-28 (5th Cir. 1966). A labor dispute may also exist even though the otherwise legitimate union conduct is unlawful under some other statutory scheme. See, e.g., Marine Cooks & Stewards v. Panama Steamship Co., 362 U.S. 365, 370-71, 80 S.Ct. 779, 783-84, 4 L.Ed.2d 797, 801-02 (1960); Order of R.R. Telegraphers v. Chicago & N.W. Ry., 362 U.S. 330, 339 n.15, 80 S.Ct. 761, 766 n.15, 4 L.Ed.2d 774, 781 n.15 (1960); Milkwagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. at 103, 61 S.Ct. at 128, 85 L.Ed. at 70. But neither situation is present here. Our holding, therefore, is necessarily a very narrow one: where a labor organization purposefully adopts violence as its course-violence not associated with or happening to result from any ongoing legitimate union conduct, the union is not participating in a labor dispute within the meaning of 29 U.S.C. § 113(c). Since the violence at the Alligator Bayou construction site did not occur in conjunction with a labor dispute, the clear-proof standard of section 106 is not applicable.
 
 B. Sufficiency of the Evidence
 
 100
 The unions finally urge that the evidence adduced at trial is insufficient to support the judgment against them under any standard of proof. After carefully reviewing the entire record, we agree that the evidence does not warrant the district court's finding of involvement in the conspiracy for many of the unions vouched in judgment. However, as to the remaining unions, we cannot say that the factual conclusions reached by the district court are clearly erroneous.
 
 
 101
 The factual findings made and the inferences drawn by the district court "come here well armed with the buckler and shield" of the clearly erroneous rule embodied in Federal Rule of Civil Procedure 52(a). Horton v. U. S. Steel Corp., 286 F.2d 710, 713 (5th Cir. 1961). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765 (1948). The appellate court must be especially reluctant to disregard a factual finding based upon the evaluation of testimony that draws credibility into question, Graver Tank and Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 275, 69 S.Ct. 535, 537-38, 93 L.Ed. 672, 676 (1949); it may not consider the evidence anew, Zenith Radio Corp. v. Hazeltime Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 151 (1969); and merely because it might have reached a different result on the same evidence will not justify its setting the district court's findings aside. United States v. National Ass'n of Real Estate Bids, 339 U.S. 485, 495-96, 70 S.Ct. 711, 717, 94 L.Ed. 1007, 1016 (1950).
 
 
 102
 The court below concluded that the assault on the Alligator Bayou construction site "evolved from a meeting held by the Executive Committee of the Sabine Area Building and Construction Trades Council on January 15, 1975, wherein a 'citizen protest' was discussed and a time and place were chosen for such a protest." 461 F.Supp. at 226. However, the evidence in the record does not support this inference. There was nothing unique about the January 15 congregation; it was the Council's regularly scheduled weekly meeting. The minutes of the meeting contain only one cryptic entry which might conceivably be construed to refer to the Cross construction site protest, and it is wholly innocuous.[15] In addition, those union representatives who actually attended the meeting testified that the committee discussed the Cross project and that some members mentioned they had heard of a demonstration to be held on the jobsite the following Friday. The import of their testimony is that the protest had already been conceived several weeks before January 15 and that neither the time nor the place for it were set by the Council. Furthermore, there is no evidence that the Council endorsed the planned protest: no motions were offered and no formal resolutions were adopted. The only connection between the Wednesday meeting and the Friday violence is the nearness in time between the two events. Given the regular sequence of such weekly meetings, this link is too tenuous. As to those unions linked only by the evidence of their participation in the January 15 meeting of the Sabine Area Building and Construction Trades Council, the judgment of the district court must be reversed.
 
 
 103
 An additional fact casts the district court's error into even sharper relief. The court exonerated two unions as to which the only evidence of involvement was their representation at the January 15 meeting, yet it held other unions liable even though the proof against them was no stronger. Furthermore, the district court held the Operating Engineers, Local 450, liable, and that organization neither belonged to the Building and Construction Trades Council nor attended its January 15 meeting nor was otherwise shown to be connected with the violence. The additional evidence relevant to the Operating Engineers is no more compelling. The judgment against the union of Operating Engineers, Local 450, too must be reversed.
 
 
 104
 However, the situation is different with respect to the United Brotherhood of Carpenters and Joiners of America, Local 610. In mid-summer of 1974, before construction began on the Alligator Bayou project, Cross received a visit in his Houston office from an official of the union. John Wallace, financial secretary and business representative for the Carpenters Local 610, gave Cross his business card and informed him that he wanted the union to furnish laborers for the job. He also asked Cross to sign a union contract. Cross agreed to hire members of Wallace's union but refused to enter into the proposed agreement. Wallace then told Cross that his refusal would "cost him a million dollars."
 
 
 105
 Wallace had no further contact with the Alligator Bayou project until January 17, 1975, when the attack occurred. On that day, Wallace was present at the highway near the access road which led to the Cross jobsite on at least two separate occasions. More damaging, however, is the fact that Wallace was also observed with Robert Faulk, subsequently identified as one of the principal participants in the violence committed that morning. The two men, riding in Wallace's pickup truck, drove part of the way down the road leading to the construction site, confirmed that the Cross workers had arrived at the scene, and returned to the highway. Shortly thereafter, the mob attacked Cross's workers. Wallace admitted that he was at the highway and that he and Faulk approached the construction site together. Not surprisingly, however, his version is less sinister. He also testified that he saw some members of Local 610 and that, before leaving the area, he expressly instructed them not to engage in any violence. From this evidence, the district court concluded that the union had actually participated in the conspiracy, and we cannot say that his factual inferences and credibility resolution are clearly erroneous. Therefore, the judgment against the United Brotherhood of Carpenters and Joiners, Local 610, is affirmed.
 
 
 106
 Similarly, we affirm the judgment against the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 195. Bruce Hill, one of two business representatives for the local, appeared at the Cross construction site shortly after the violence had ended. Fulton Johnson, the Corps of Engineers inspector assigned to the Alligator Bayou project, described Hill's conduct at the scene. He testified that Hill was laughing and joking and that his light-hearted demeanor and remarks were highly inappropriate for the gravity of the situation. While Johnson and a colleague were attempting to take photographs of the damage, Hill repeatedly interposed himself in front of the camera, urging him to take his photograph with a burning trailer behind him. Johnson recalled that Hill sarcastically told them he wanted the photograph to post on the bulletin board at the local so that "he could show his men what not to do."
 
 
 107
 Like Wallace, Hill himself gave a more innocent account of the episode, and denied saying that he wanted the picture for the union bulletin board. His explanation for seeking the photograph was, "I don't know. I guess I am a camera freak. I like to have my picture taken." Although the local's other business representative had attended the January 15 meeting of the Trades Council when the protest was discussed, Hill said he first learned of the events around 8:00 that Friday morning when he overheard some men talking at a grocery store. He stated that he went to the Cross construction site to check on a friend who worked nearby, even though he had never been there to see him before. Although the evidence is sparse, we cannot say that the district court's finding that the Pipefitters Local 195 was involved in the conspiracy is clearly erroneous.
 
 
 108
 Lastly, we also affirm the district court's finding as to the United Brotherhood of Carpenters and Joiners of America, Local 753. Jay Desormeaux and Curtis Beasley, members but not officers of Local 753, were both observed on the Cross construction site during the violent melee of January 17. Desormeaux recounted a conversation he had with Randy Wylie, assistant business agent for the local, on the preceding Wednesday or Thursday when they discussed the planned protest. Wylie admitted that Desormeaux had called him to ask about the demonstration but denied instructing him to go to the work site. Wylie also admitted seeing Desormeaux at the highway on the fateful Friday morning.
 
 
 109
 There was still more evidence suggesting that the union had authorized the unlawful conduct. Both Desormeaux and Beasley were named as defendants in this lawsuit. Beasley testified that, after the suit was commenced, Wylie had referred him to the union's own lawyers for representation in matters connected with his part in the violent events of January 17. Desormeaux also stated that he had spoken with both Wylie and W. H. Carr, business agent for Local 753, about obtaining a lawyer and expressed his belief that the union would pay his attorney fees. Carr informed Desormeaux that the union furnishing him with a lawyer would be "the least they could do," since he was a union member. However, Desormeaux knew of no formal arrangement by which the union regularly provided legal services to its members and conceded that the union had never done so for him. Wylie denied talking with Desormeaux about attorney fees, but, apart from that denial, the union made no effort to rebut this testimony. It did not deny furnishing legal services for its members in actions arising from the violence. The evidence in the record permitted the inference that the union sponsored the attack on the Cross employees and then undertook to lend assistance to its members who were discovered in the unlawful enterprise. The appellate issue is not whether we might have taken a different view had the evidence been presented initially to us. It is whether the district court's determination that the Carpenters Local 753 authorized or participated in the attack is clearly erroneous. It is not.
 
 VI. CONCLUSION
 
 110
 In summary, we hold that (1) the anti-injunction provisions of the Norris-LaGuardia Act do not deprive the district court of jurisdiction to enjoin violence, and (2) Congress intended 42 U.S.C. § 1985(3) to provide a remedy for private conspiracies directed at nonracial classes. Specifically, we determine that the statute encompasses a conspiracy designed to deprive nonunion workers of the First Amendment right to freely associate with one another where that conspiracy does not occur in conjunction with legitimate union activity and is perfected by force and violence. In addition, we hold that the Commerce Clause empowers Congress to reach the private conspiracy involved in the case before us. Furthermore, since this case does not involve a labor union participating or interested in a labor dispute within the meaning of 29 U.S.C. § 113(c), the clear-proof standard of 29 U.S.C. § 106 is inapplicable. We conclude that the district court's findings that the Carpenters Local 610, Pipefitters Local 195, and Carpenters Local 753 authorized or participated in this conspiracy were not clearly erroneous. Nevertheless, we find that the evidence of participation in the conspiracy is insufficient to warrant the district court's judgment against the remaining eight unions.
 
 
 111
 In light of the foregoing, the judgment of the district court is
 
 
 112
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 113
 ALVIN B. RUBIN and JERRE S. WILLIAMS, Circuit Judges, with whom JOHN R. BROWN, VANCE, KRAVITCH, RANDALL, TATE and SAM D. JOHNSON, Circuit Judges, join, dissenting:
 
 
 114
 No one can condone an unprovoked and brutal attack on law-abiding citizens who are peacefully minding what is literally their own business. However, the issue before us is not the reprehensibility of the conduct but whether the district court properly issued an injunction in a case over which, we submit, Congress has, by the terms of the Norris-LaGuardia Act, denied federal courts jurisdiction. Our colleagues also interpret the Ku Klux Klan Act of 1871 in an unprecedented fashion to permit damages to be imposed for an assault, a state law tort, merely because it occurred in the course of a dispute about whether union or nonunion workers would do a job. Further our colleagues impose this liability without the stringent evidentiary findings exacted by the Norris-LaGuardia Act. We, therefore, respectfully dissent.
 
 
 115
 The factual background is accurately stated in the majority opinion. These facts lead the majority to conclude that the defendant labor organizations purposefully adopted violence as their course, page 1001 supra, that a group of about fifty persons who were either union members or union sympathizers drove to the jobsite in four pickup trucks, and there brutally beat A. A. Cross ("Cross"), the president and controlling stockholder of A. A. Cross Construction Company, Inc. ("Cross Construction"), and several of the construction company's employees, including Paul Scott and James Matthews. Scott was an engineer and assistant superintendent; Matthews was a bookkeeper and timekeeper.[1]
 
 
 116
 I. THE PRIVATE INJUNCTION AND THE NORRIS-LAGUARDIA ACT
 
 
 117
 The judgment of the district court affirmed by the majority included a permanent injunction against the defendant labor organizations. The majority, in finding that the district court had authority to issue the injunction, neglects the original purpose, as well as the half century of interpretation and application, of the Norris-LaGuardia (Anti-Injunction) Act, 29 U.S.C. §§ 101-115 (1976), passed in 1932.
 
 
 118
 The patent purpose of the Norris-LaGuardia Act was to limit stringently the jurisdiction and authority of federal courts to enjoin labor disputes.[2] The Act requires three determinations. First, the court must decide whether a labor dispute is involved. Second, to have jurisdiction to issue an injunction under the Act, the court must make all five findings required by 29 U.S.C. § 107: (1) unlawful acts have been threatened and will be committed or have been committed and will be continued; (2) irreparable injury will follow; (3) the balance of injury is more severe on the complainant than the harm the injunction inflicts on the defendant; (4) there is no adequate remedy at law; and (5) the public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection. Third, the injunction, if issued, must not prohibit any of the activities listed in 29 U.S.C. § 104.[3]
 
 
 119
 The majority concedes that the requirements of § 107 were not met in this case, page 986 n.3 supra, but sidesteps deciding whether this is jurisdictional. The statute itself, however, is unequivocal: "No court of the United States shall have jurisdiction to issue a temporary or permanent injunction ... except after (the required) findings of fact (have been made) by the court." 29 U.S.C. § 107 (emphasis added). Indeed, the entire thrust of the Norris-LaGuardia Act is to deny district courts jurisdiction with respect to injunctions in labor disputes.[4] Our colleagues justify the injunction, however, by finding that there was no "labor dispute" as defined in the Act. That definition is:
 
 
 120
 The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
 
 
 121
 29 Id. § 113(c) (emphasis added).
 
 
 122
 Even according to the majority view, this was a "controversy concerning terms or conditions of employment" and "concerning the association ... of persons in ... maintaining ... employment." Not only was the controversy thus one literally embraced by the Act, but it was also covered by the Act's embracive purpose. The definition of a labor dispute is broad and should be broadly read because the Act caters to the need of labor organizations to organize entire industries. Gregory & Katz, Labor and the Law 190 (3d ed. 1979). It abrogates the view, once held by some, that there can be a labor dispute only between persons in an employee-employer or prospective employee-employer relationship. Instead, it includes in its ambit all laboring people and their unions. It is not confined to formal efforts to have employees sign union authorization cards. Its terms precisely characterize as a labor dispute the controversy involved in this case: a group of employees and labor unions protesting the failure of an employer working in their community to hire union workers and to sign collective bargaining agreements with local unions.
 
 
 123
 While the unions were not engaged in a formal campaign to sign up employees of Cross Construction at the exact time of the critical incident,[5] the entire thrust of their activities from the time Cross Construction entered the community was organizational. As the majority opinion indicates, on one occasion the business representative for the carpenters' local told Cross, "this is union country," and added that, if Cross persisted in using non-union labor, it was "going to cost (him) a million dollars." Page 983 supra. Cross Construction employees were confronted by local union members in various public gathering places in the community. Local unions and their members also threatened to picket the construction project because it was non-union. The public demonstration the morning the violence occurred was obviously a form of informational mass picketing to publicize Cross Construction's employment practices.
 
 
 124
 The majority finds that, "where a labor organization purposefully adopts violence as its course-violence not associated with or happening to result from any ongoing legitimate union conduct, the union is not participating in a labor dispute within the meaning of 29 U.S.C. § 113(c)." Page 1001 supra. Violence, however, is not a stranger to the labor union movement nor does its presence vitiate the existence of a dispute. If the dispute concerns labor matters, it does not cease to be a labor dispute because it becomes violent. This court early held that the use of violence to achieve a labor objective does not prevent the activity from being considered a labor dispute within the Norris-LaGuardia Act. Carter v. Herrin Motor Freight Lines, Inc., 131 F.2d 557 (5th Cir. 1942). This view is amply supported throughout the history of litigation under the Act.[6]
 
 
 125
 The majority concedes that "a labor dispute does exist where unlawful conduct occurs in conjunction with some legitimate union activity .... (or where) the otherwise legitimate union conduct is unlawful under some statutory scheme." Page 1001 supra. This fails to explain why unlawful conduct falls within the ambit of the Act only if it is connected with legitimate[7] union conduct, for the Norris-LaGuardia Act does not confine its definition of labor disputes to those involving legitimate conduct. Indeed, by definition, the Act is applicable only when the union is engaging in unlawful conduct.[8] We cannot assume that any court would issue an injunction against lawful activities, and of the five prerequisites to the issuance of an injunction, already listed, one demands a finding that unlawful acts have been threatened and will be committed.
 
 
 126
 A "labor dispute" can, indeed, be fomented even without traditional labor activity. Thus in New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), a grocery store owner was picketed by a group protesting the shop's refusal to hire blacks. No member of the group was employed by the shop, and the group was not a labor organization. The Supreme Court, nevertheless, held that the pickets were publicizing a controversy about the shop owner's "terms and conditions of employment" and that the picketing grew out of a labor dispute.[9]
 
 
 127
 National policy, as reflected in labor legislation, was being implemented precisely as Congress intended until the district court granted the injunction at the behest of Cross Construction. The National Labor Relations Board ("NLRB") had filed unfair labor practice charges against the Sabine Area Building and Construction Trades Council and the various unions that were council members for their actions, including the violence in the episode that is the subject of this lawsuit. The NLRB had issued a cease and desist order that prohibited the Trades Council and the unions from, among other things:
 
 
 128
 (a) Restraining or coercing employees of Cross Construction Co., Inc. or any other employer, in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act, as amended, including the right to refrain from joining or assisting any constituent local union of Sabine Area Building & Construction Trades Council, AFL-CIO, by: threatening, assaulting, or inflicting bodily harm on said employees, threatening, assaulting, or inflicting bodily harm on supervisory or management personnel of Cross Construction Co., Inc.; and damaging or destroying property and equipment belonging either to Cross Construction Co., Inc., to its supervisory or management personnel, or to its employees.
 
 
 129
 (b) Organizing, encouraging, sanctioning and engaging in mass picketing by its constituent local unions at the entrance to the roadway leading to the Alligator Bayou Pumping Station and Drainage Structure construction project in order to obstruct or impede ingress or egress to said jobsite.
 
 
 130
 NLRB Case 23-CB-1624, May 1, 1975.
 
 
 131
 This order says it all. It was upheld and enforced by us as a result of a settlement stipulation in an unpublished opinion,[10] long before the injunction was issued in this case. Ironically, the majority finds no "labor dispute" in the very situation that caused the NLRB to file charges and to issue a stipulated cease and desist order. The NLRB had jurisdiction only if there was a labor dispute. Thus we at once hold an occurrence not to be a labor dispute for purposes of the Norris-LaGuardia Act (which emphasizes the breadth of the definition of labor dispute)[11] but to be one for purposes of the National Labor Relations Act ("NLRA") despite universal recognition that the "definition of 'labor dispute' in this Act (NLRA) and in the Norris-LaGuardia Act ... are virtually identical."[12]
 
 
 132
 The brutal assault on Cross Construction employees was overt criminal conduct that should also have been and was prosecuted by state law enforcement authorities. The Act permits injunctive intervention only when "public officers charged with the duty to protect complainant's property (and, we submit, their persons) are unable or unwilling to furnish adequate protection," 29 U.S.C. § 107(e), against future, not past unlawful activity.[13]
 
 
 133
 The Supreme Court has just reaffirmed the broad interpretation of the definition of labor dispute in the Norris-LaGuardia Act which has been the law since the Act was passed. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association, --- U.S. ----, 102 S.Ct. ----, 72 L.Ed.2d ----, 50 U.S.L.W. 4789 (U.S., June 24, 1982). As reported in the majority opinion (fn. 14), the Court held that a dispute involving the refusal to load cargo to Russia in protest of Soviet intervention in Afghanistan was a labor dispute within the meaning of the Act.
 
 
 134
 The majority opinion relies upon the Court's statement that the employer-employee relationship was the "matrix" of the dispute in Jacksonville Bulk Terminals. First, it needs to be emphasized that, as pointed out above, a unionized workforce was the "matrix" of the dispute in the instant case-clearly a labor dispute objective. Second, the matrix statement must be taken in the context that Jacksonville Bulk Terminals was a dispute between employers and their employees. As has been shown above, the employer-employee relationship is not a requirement to establish a labor dispute under the Act. Indeed, to show the breadth of the definition of labor dispute in the Act, the opinion in Jacksonville Bulk Terminals relies heavily upon the New Negro Alliance case, supra, where there was not even a prospective employer-employee relationship.
 
 
 135
 What is of most importance in Jacksonville Bulk Terminals is the Court's extensive emphasis upon the history of the development of the Norris-LaGuardia Act to show the breadth of the definition of labor dispute. The Court said that to narrow the definition would "embroil federal judges in the very scrutiny of 'legitimate objectives' that Congress intended to prevent when it passed the Act." --- U.S. at ----, 102 S.Ct. at ----. The Court then concluded: "In the past, we have consistently declined to constrict Norris-LaGuardia's broad prohibitions except in narrowly defined situations where accommodation of that Act to specific congressional policy is necessary. We refuse to deviate from that path today." Id. (emphasis added).
 
 
 136
 No specific congressional policy exists in this case to justify deviation. Instead, congressional policy as clearly established was carried out in the action under the National Labor Relations Act.
 
 
 137
 The Norris-LaGuardia Act applies to every kind of labor dispute, and not only to conventional organizing campaigns conducted under the auspices of the NLRB. Indeed, as both the NLRB and a panel of this court have found, this was plainly an organizational labor dispute. The federal district court had no jurisdiction to issue the injunction.
 
 
 138
 II. SECTION 1985(3) DOES NOT GRANT A CAUSE OF ACTION FOR THE DEFENDANTS' CONDUCT
 
 
 139
 A. The Nature of the Right for Which § 1985(3) Provides a Remedy
 
 
 140
 Section 1985(3) provides that an injured party "may have an action for the recovery of damages" "(i)f two or more persons ... conspire ... for the purpose of depriving ... any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3) (emphasis added).[14] This language does not establish a cause of action for every deprivation of any legal right, privilege, or immunity. The statute condemns only conspiracies to deny equal protection or equal privileges and immunities. If these restrictive terms are overlooked in interpreting the statute, its reach is ubiquitous; for it would then authorize a federal tort action for every conspiracy to deprive any person or class of persons of any legal right.
 
 
 141
 In Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court recognized that § 1985(3) is premised on a conspiracy to deny equality and is not a general federal tort law.[15] To show that the conspiracy was designed to deny a person equality, the Court said, the plaintiff must demonstrate that the purpose of the conspiracy was "a deprivation of the equal enjoyment of rights secured by the law to all," not merely the infliction of an injury on that person. Id. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 (emphasis added). The necessary corollary is that a conspiracy merely to injure one person or a group of persons, or even some or all of the members of a class of persons, does not give rise to an action under the statute.
 
 
 142
 This interpretation of the statute is supported by the history of its enactment. That history, often recounted in fragments, is reported at length in Comment, A Construction of Section 1985(c) in Light of Its Original Purpose, 46 U.Chi.L.Rev. 402 (1979).[16] Section 1985(3) was adopted in reaction to the activities of the Ku Klux Klan. The original Klan, which had begun to operate in the South prior to 1871, was for the most part a political organization.[17] In enacting § 1985(3), Congress did not seek primarily to prevent racial discrimination but to proscribe conspiracies whose objective or effect was to frustrate the "constitutional operations of government through assaults on the person, property, and liberties of individuals."[18]
 
 
 143
 The Forty-Second Congress, dominated by a Republican majority, became alarmed at reports of violent activities of the Klan and similar organizations, such as the Knights of the White Camelia, the White Brotherhood, the Pale Faces, and the '76 Association.[19] It established a joint committee to investigate the Klan.[20] The Republican majority thought the Klan's objective was to wrest control of the southern state governments from the Republican Party and to reestablish Democratic governance.[21] Democrats also viewed the Klan's objectives as political,[22] but considered them honorable, adopted to resist unjust laws and to restore control of governmental affairs to "the wise, virtuous, influential men of the South," dislodging "adventurers and negroes."[23]
 
 
 144
 The first proposed Ku Klux Klan Act made it criminal to conspire to commit particular crimes "in violation of the rights, privileges, or immunities of any person, to which he is entitled under the Constitution and laws of the United States."[24] It authorized no civil action. Some more moderate Republicans opposed the proposal as a usurpation of the states' power to punish crimes. Other members of Congress opposed the enactment on the basis that the federal government lacked power to prohibit the acts of private individuals. Another group believed that Congress could punish only those "private conspiracies intended to obstruct the performance of government officials' constitutional duty to provide equal protection of the laws."[25] Still others believed that, regardless of its power, the federal government should provide protection for individuals against private conspiracies only when the state failed to do so.[26]
 
 
 145
 An amendment suggested by Congressman Burton Cook (R-Ill.) and drafted by Congressman Charles Willard (R-Vt.)[27] satisfied the constitutional objections and provided an acceptable compromise. For the language first proposed in the criminal statute prohibiting conspiracies "in violation of the rights, privileges, or immunities of any person, to which he is entitled under the Constitution and the laws of the United States," the amendment substituted the words "for the purpose of depriving any persons or class of persons, directly or indirectly, of the equal protection of the laws, or of equal privileges and immunities under the laws."[28] The amendment also added the civil cause of action that we now consider.[29]
 
 
 146
 It is thus obvious that one purpose of this amendment was to confine the operation of the statute to discriminatory deprivations of rights. As the draftsman of the limiting amendment, Representative Willard, said, the amendment "provid(ed) that the essence of the crime should consist in the intent to deprive a person of the equal protection of the laws and of equal privileges and immunities under the laws; in other words, that the Constitution secured, and was only intended to secure, equality of rights and immunities, and that we could only punish by United States laws a denial of that equality."[30] Congressman Horatio Burchard (R-Ill.) explained that the conspiracies condemned were "those designed to prevent the equal and impartial administration of justice.... The gravamen of the offense is the unlawful attempt to prevent a State through its officers enforcing in behalf of a citizen of the United States his constitutional right to equality of protection."[31] Others echoed this analysis.[32]
 
 
 147
 In Griffin, the Supreme Court interpreted § 1985(3) in a fashion consistent both with its literal language and this congressional intention:
 
 
 148
 The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.
 
 
 149
 403 U.S. at, 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 (footnotes omitted). The statute thus has a "motivation aspect." Relying on the legislative history we have recounted, the Griffin Court explained that the requirement of "invidiously discriminatory motivation stressed by the sponsors of the limiting amendment" was necessary to avoid "constitutional shoals." Id. The forbidden purpose of § 1985(3) is the denial of equality under the laws, not merely an injury forbidden by law.[33]
 
 
 150
 Although § 1985(3) reaches both public and private conspiracies to deny constitutional equality, it is a non sequitur to conclude that it, therefore, reaches all constitutional violations. The statute is not designed to protect constitutional rights; it is at once narrower, safeguarding equality, and broader, protecting against any conspiracy to deny equal protection of the "laws."[34]
 
 
 151
 The Supreme Court held in Griffin that the reach of § 1985(3) is limited by the requirement that the conspiracy be directed at a denial of equality. Our colleagues state, however, that in Griffin "(t)he blacks brought an action under section 1985(3) to redress violations of the laws of the United States and of Mississippi, including the rights of free speech, assembly, association, interstate travel, liberty, and security of their persons." Pages 986-987 supra (emphasis added). If that were the basis of the action in Griffin, then Griffin would be authority for a simple tort action. The complaint in Griffin was more subtle.[35] In addition to the language quoted by the majority, the complaint stated that the purpose of the conspiracy " 'was to prevent (the) plaintiffs and other Negro-Americans, through ... force, violence and intimidation, from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the State of Mississippi, including ... their rights to freedom of speech, movement, association and assembly.' " 403 U.S. at 90, 91 S.Ct. at 1792, 29 L.Ed.2d at 341. The assault on and battery of the plaintiffs were acts done in furtherance of the conspiracy to deny the plaintiffs equal rights, not acts designed merely to injure the plaintiffs or to deprive them of the protection of the law.
 
 
 152
 In Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957, 963 (1979), the Supreme Court held that "(s)ection 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates."[36] Thus, § 1985(3) provides a cause of action for private interference only with those rights that the Federal Constitution protected prior to the enactment of the Civil Rights Act of 1871, and in particular, for those rights protected by the newly ratified fourteenth amendment. See Novotny, 442 U.S. at 383, 99 S.Ct. at 2354, 60 L.Ed.2d at 970 (Stevens, J., concurring). Insofar as equal protection of the laws is concerned, the cause of action is restricted not only to conspiracies to deny equality, but the conspiracy must also be directed at the denial of protection of the laws, in the sense that it must be aimed at preventing the injured party from obtaining legal protection. See id. at 384, 99 S.Ct. at 2355, 60 L.Ed.2d at 971; A Construction of Section 1985(c), supra note 17, at 407, 419.
 
 
 153
 The extension of § 1985(3) to protect against private infringement of every right protected against governmental action by the Constitution would create a Bivens -type tort action against every private conspiracy that affects a federal constitutional right.[37] A citizen has a right to be secure in his property and home, but we do not think that § 1985(3) confers a cause of action for a conspiracy by a person's neighbors to block his driveway in order to keep him from driving his automobile to his place of business. The fourth amendment protects against illegal searches, but we do not think that, if two persons conspire to search their neighbor's house, the neighbor has a § 1985(3) action.[38] In neither case would the addition of violent overt acts metamorphose the tort into a § 1985(3) cause of action.
 
 
 154
 Unlike Griffin, this case does not rest on the adequacy of notice pleading. The plaintiffs have had their day in court. They proved no conspiracy to prevent them from seeking the equal protection of the laws, or to deny them that protection, or to bar them from enjoying the equal rights, privileges, and immunities of citizens under the laws. Even if there is a "First Amendment right to associate with their fellow nonunion employees," page 988 supra, a question to which we will soon turn, it would not suffice to prove a conspiracy aimed at denying the plaintiffs this "right." Our colleagues, mistakenly we suggest, assume that "curtailment of (plaintiffs') interests secured by the First Amendment is a deprivation of equal protection of the laws within the meaning of section 1985(3) as interpreted by Griffin." Page 988 supra (emphasis added). The mere deprivation of a right, however fundamental, is not a deprivation of equal protection. For a denial of equality to be the conspiratorial objective, the conspirators must seek to permit some persons to enjoy the protected right and to deny it to others. The reprobated objectives alleged in Griffin included, for example, the denial of the right of black persons to " 'travel the public highways without restraint in the same terms as white citizens in Kemper County, Mississippi.' " 403 U.S. at 92, 106, 91 S.Ct. at 1793, 1800, 29 L.Ed.2d at 342, 350 (quoting the complaint). The proof in this case shows no comparable objective; the defendants did not seek to deny the right to work with nonunion workers to the individual plaintiffs while according that right to others.
 
 
 155
 B. The Right Found Protected by the Majority
 
 
 156
 Our colleagues interpret § 1985(3) to find that it protects a constitutional right of association, or more specifically, the constitutional right, first found to exist in this very opinion, of nonunion workers to work with other nonunion workers. This right is analogized to the right of political association. Protection for political association is thus expanded into protection for any kind of association having some economic community of interest. This seems to us to confuse the right protected with the class of persons protected. Although there is a constitutional right to refuse to work, no court, so far as we know, has ever previously found that workers have a constitutional right to work only with the kind of persons they choose to work with.
 
 
 157
 If nonunion workers have a constitutional right to work together, then the collective bargaining policy of the National Labor Relations Act is at least in part unconstitutional. Under it, nonunion workers have the right to join or not to join a union. 29 U.S.C. § 157. They have the right to vote against or for a union in a collective bargaining election. Id. If, however, a collective bargaining agent is chosen, the workers do not have a constitutional right to bargain individually or to work only with nonunion associates. They may be required to become union members thirty days after being hired, id. § 158(a)(3), unless the state has a "right to work" law.[39] Once an employer is ordered to bargain collectively, employees who are not union members are compelled to work with union members if they choose to work at all. Their employer certainly has no right to employ only nonunion labor-unless the National Labor Relations Act is unconstitutional.
 
 
 158
 This case does not involve the question whether a person has a right to join or not to join a union, to affiliate or not to affiliate with a political group, or to believe or disbelieve a creed. The desire to work for a nonunion employer cannot be escalated into a first amendment associational right. "What the (Supreme) Court has recognized as implicit in the first amendment ... is a right to join with others to pursue goals independently protected by the first amendment-such as political advocacy, litigation (regarded as a form of advocacy), or religious worship."[40] Although there is obviously some political content in union activity, nonmembership in a union is not a goal independently protected by the first amendment.
 
 C. Discriminatory, Class-Based Animus
 
 159
 The majority does not hold Cross Construction to be a member of any class. We search the majority opinion in vain for something more than an ad hoc definition of the class to which the plaintiffs Scott and Matthews belong. After discussing the necessity of discriminatory class-based animus for two and one half pages, our colleagues state conclusorily, "the plaintiffs constitute a class for 1985(3) purposes."[41] They then discuss the labor union movement and the reputed kinship of economic views with political association, and state that "the plaintiffs were attacked because of their economic, rather than their political, association."[42] In the next sentence we are told that there was animus against the plaintiffs for their "nonunion association." The plaintiffs are later referred to as "nonunion employees" and, without noting the distinction, as "nonunion workers who are attacked for their choice to associate with other nonunion workers." Page 994 supra. It is difficult for us to divine exactly what class is intended by these differing phrases, for the evidence makes it clear that Scott and Matthews were not attacked because they were not union members or because they wished to work with "other" nonunion members, but because they chose to work for Cross Construction, a firm that hired nonunion workers and did not pay union wages.[43] Scott was a supervisor and Matthews was a clerical worker. It has not been shown that either of them was even eligible for membership in any of the unions involved.
 
 
 160
 Let us assume, however, that the facts can be construed to make Scott and Matthews members of a class of persons who do not belong to a union and want to work with people who are also nonunion. This, we submit, is not a class protected by § 1985(3). The Supreme Court in Griffin said, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" to warrant § 1985(3) relief.[44] We have gone further and held that § 1985(3) forbids not only racial discrimination but the denial of equality to other classes:[45] those having common characteristics of an inherent nature; that is, classes accorded special protection by the equal protection clause of the fourteenth amendment and "the kinds of classes Congress was trying to protect when it enacted the Ku Klux Klan Act." Kimble v. D. J. McDuffy, Inc., 648 F.2d 340, 347 & n.9 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981).[46] The phrase "the kind of classes Congress was trying to protect" states a purely historical test, directing us to look to the purposes of the Ku Klux Klan Act when it was adopted. Kimble suggested as an illustration of classes in this category conspiracies based on the target's affiliation with a major political party. Id.
 
 
 161
 The majority opinion holds that, although the "(p)laintiffs are not a class normally afforded special protection under the equal protection clause merely because they wish to work nonunion," page 991 supra, and although "Congress did not express a specific intent to protect nonunion employees in enacting the Ku Klux Klan Act, the legislative history demonstrates that the nonunion employees in this case comprised the kind of class Congress intended to protect," page 994 supra. We differ with this conclusion also.
 
 
 162
 The plaintiffs are, we submit, not members of a class at all,[47] but simply two individuals injured in the same assault. The majority agrees that not every conceivable grouping of persons capable of being defined as a class is protected by § 1985(3). Page 992 supra. Not only must the class share some common characteristic beyond simply being the victims of a conspiracy, but it must also be distinguishable from the general populace by this characteristic. Id. These are but first steps, and do not enable us to define the § 1985(3) class, for many clearly defined and easily identifiable groups of persons who might be considered a "class" for some other purpose have been denied § 1985(3) class status: homosexuals,[48] tenant organizers,[49] debtors,[50] persons who file voluntary petitions in bankruptcy,[51] physicians who testify in malpractice suits,[52] injured workers who assert claims,[53] and trade association members.[54]
 
 
 163
 The majority looks to our en banc decision in McLellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir. 1977), for the gauge to measure whether the Scott-Matthews class is the kind of class Congress intended to protect when it enacted § 1985(3). They correctly recount the three reasons given in McLellan for holding that § 1985(3) does not cover persons who file voluntary petitions in bankruptcy.[55]
 
 
 164
 First, the legislative history of the Ku Klux Klan Act contains no evidence of congressional concern about discrimination against persons who become insolvent. Second, while the protection afforded by the civil rights acts is not static, it would be inappropriate to enlarge the group of protected classes to include bankrupts when Congress had specifically declined to prohibit discrimination against them. Third, including bankrupts within the ambit of Section 1985(3) would be unwarranted in light of the Supreme Court's refusal to characterize the right to file a bankruptcy petition as a fundamental right.
 
 
 165
 Page 992 supra.
 
 
 166
 But, as our colleagues acknowledge, McLellan does not attempt to define what groups are and what groups are not § 1985(3) classes. Id. McLellan sets up only some of the criteria for exclusion. To determine that the present group is included as a § 1985(3) class because it is not one of those excluded by McLellan is to adopt the erroneous premise that all classes are comprehended except those barred for the same reason bankruptcy petitioners were eliminated by McLellan.
 
 
 167
 Furthermore, we believe that the majority's analysis of the McLellan factors is incorrect. The legislative history and, indeed, the popular name of the statute make clear the evil that was addressed, the Ku Klux Klan. Congress in 1871 was assuredly not trying to protect non-union workers, not only because it would not then have recognized the difference between union members and non-members but simply because the Klan posed no threat to such workers. The regional hostility the majority finds as a second identification for an appropriate class could scarcely embrace Cross Construction, a Texas corporation, Paul Scott, a resident of Texas, or James Matthews, also a resident of Texas at the time of the incident. Nor does subsequently enacted federal labor legislation suggest that Scott and Matthews are members of a class protected by § 1985(3). That legislation expresses the national labor policy as encouraging collective bargaining. 29 U.S.C. § 102. Although Congress has recognized the "right to refrain from any or all such activities," id. § 157, it has never adopted a national labor policy protecting an individual's "right" to work for a nonunion employer. The right to belong or not to belong to a union is considerably different from the asserted "right" to work for a nonunion employer, for, as we have already seen, every employer whose activities affect interstate commerce and his employees are subject to the requirements of collective bargaining. Id. § 158(d). Finally, the kinship asserted by the majority to exist between economic and political association is a strange one, for in this country our political parties embrace the entire spectrum of economic classes.
 
 
 168
 If the class recognized by the majority includes, as we have supposed, persons who do not belong to a union and who want to work for an employer who hires other nonunion employees, there are yet other reasons not to accord such a class § 1985(3) protection. This class is one newly defined by this case, not one having any previous discernible jurisprudential identity. It is not a "class" marked by historical oppression, by minority status, by any social or political animus directed against it, by any political or religious belief, or by any of the indicia usually used to identify a class of persons who must be accorded special protection. The animus here was not directed at the membership of the plaintiffs in such a class or at their association together either as persons or in some anti-union group campaign, but at their activities: working without union membership for an employer who wished to hire them.
 
 
 169
 D. The Corporation as a Beneficiary of § 1985(3)
 
 
 170
 The majority rejects the view that Cross Construction is a member of the protected class.[56] They manage to find a § 1985(3) cause of action in favor of Cross Construction, however, by holding that the statute extends a remedy to any person injured by a forbidden conspiracy despite the fact that he is not within the protected class.[57] This view extends § 1985(3) protection to injured persons outside the protected class even if no member of that class has filed suit. By this reasoning, if, in the present case, a person had been injured by the negligence of the driver of one of the pickup trucks speeding from the scene of the attack, he would also be entitled to sue under the statute's aegis.
 
 
 171
 The Ninth Circuit has considered this reading of the statute and rejected it.[58] The only authority cited for the creation of this penumbra is the dissenting opinion of Justice White in Novotny.[59]
 
 
 172
 The majority opinion in Novotny held, however, that § 1985(3) created no new rights but is remedial in nature, and rejected Justice White's view. The majority here finds a substantive cause of action in the statute for non-class members. This is not only, we submit, a misreading of the statute, but also a rejection of the authority by which we are bound.
 
 
 173
 E. The Constitutional Question: The Source of Congressional Power
 
 
 174
 The Supreme Court recognized in Griffin that § 1985(3), if applied literally to every situation apparently embraced by it, might in some applications exceed Congress's authority.[60] Therefore, as the majority opinion recognizes, "a source of congressional power must be identified to warrant application of the statute in each case."[61] Our colleagues accurately describe the controversy concerning "the extent to which section 5 of the Fourteenth Amendment grants Congress the power to reach wholly private conduct."[62] Pretermitting that issue, they find authority for the present application of § 1985(3) in the commerce power.[63]
 
 
 175
 Although the power of Congress under the commerce clause is broad enough to permit it to reach any private conspiracy designed to affect interstate commerce,[64] Congress assuredly did not rely on the commerce clause in enacting § 1985(3). The statute does not invoke the commerce clause, nor does it distinguish between conspiracies that affect interstate commerce and those whose aim is solely intrastate.
 
 
 176
 The debates of the 1871 Congress focused on the constitutional power of Congress under the thirteenth, fourteenth, and fifteenth amendments. Griffin found congressional power also in the constitutional protection afforded interstate travel.[65] The Forty-Second Congress, accustomed to a narrow construction of the commerce clause[66] and seeking to reach conspiracies that denied equality whether or not interstate commerce was implicated, never considered the commerce clause as its authority.
 
 
 177
 When the Congress has relied upon the commerce clause, it has either defined the necessary commerce impact in the statute or given authority to an administrative agency to define the triggering amount of interstate commerce. Thus, in some instances, Congress has sought to reach every transaction "affecting" interstate commerce.[67] In other instances, Congress has exerted power only when there is a prescribed volume of interstate transactions.[68] There are no such indications of congressional intent here and no statutory guides for the quantum of interstate activity necessary to activate the statute.
 
 
 178
 The majority appears to assume that Congress intended to authorize a remedy for any conspiracy that might affect interstate commerce. The limits of that interstate impact must be spelled out by future decision. They also find authority to protect interstate workers, but that could scarcely justify application of the statute to Scott and Matthews, both of whom are Texans.
 
 F. Reconfining the Genie
 
 179
 Recognizing implicitly that they have released a brand new federal tort, our colleagues attempt in dicta to enclose this genie in a larger bottle. They say that they would not extend § 1985(3) to every kind of unlawful conduct, only to the limited instance where "there is no campaign to organize employees and force or violence is used to stake out one group's territorial claim and to deprive other workers and their employer of the right to freely associate with one another."[69] We see no basis in the statute for distinguishing violent unlawful conduct from other kinds of unlawful activity such as unfair labor practices, secondary boycotts, and criminal libel, or, indeed, criminally reckless driving. The rationale of the decision cannot be thus confined save by ipse dixit. If the decision is based on principle, and not like Justice Robert's railway ticket, "good for this day and train only,"[70] it extends logically not only to a multitude of "classes" having some sort of economic or "associational" tie but protects each member of those classes against any kind of unlawful conduct that results in bodily injury, or even, perhaps, economic harm.
 
 
 180
 III. THE EVIDENTIARY QUESTION: STANDARD OF PROOF AND SUFFICIENCY OF EVIDENCE
 
 
 181
 The majority holds that the existence of a conspiracy on the part of some of the unions to interfere with the constitutional rights of the plaintiffs in this case can properly be established by a preponderance of the evidence. They conclude that, because no labor dispute existed, the clear proof standard required by § 6 of the Norris-LaGuardia Act should not be applied.[71] Part I of this opinion demonstrates that this case does involve a labor dispute within the meaning of the Norris-LaGuardia Act, thus compelling the application of the more rigorous standard of proof required by the Act.
 
 
 182
 Section 6 of the Act was added to overturn decisions holding unions liable in damages for the unlawful acts of their members, and members liable for the unlawful acts of other members.[72] The Act does not immunize unions from liability but it does protect them "against liability for unauthorized illegal acts" committed during a labor dispute except upon clear proof of authorization.[73] In United Mine Workers v. Gibbs, 383 U.S. 715, 737, 86 S.Ct. 1130, 1133, 16 L.Ed.2d 218, 234 (1966), the Supreme Court held that the clear proof standard applies even when federal courts are adjudicating claims against unions based on state law.[74]
 
 
 183
 Under Gibbs, an allegation that a union has adopted a strategy of violence and intimidation to achieve labor goals is not sufficient to preclude application of the Norris-LaGuardia Act and its exacting standard of proof. As the Court there said, one of the central purposes of the Act is to insulate unions from liability for unauthorized violent sprees of the union membership. "The driving force behind § 6 ... was the fear that unions might be destroyed if they could be held liable for damage done by acts beyond their practical control." Id. at 736-37, 86 S.Ct. at 1144, 16 L.Ed.2d at 233-34.
 
 
 184
 The Court today strips unions of the protection that Congress sought to give them when a violent act occurs in a conflict engendered because of an employer's labor policies. There was enough evidence to sustain, as not clearly erroneous, a finding by the fact trier under the preponderance of evidence standard that the unions were responsible for the assault. The unions were entitled, however, to have the clear proof standard applied.
 
 
 185
 This conclusion is not inconsistent with finding the unions guilty of unfair labor practices under the NLRA. To implement later-developed national labor policy, Congress adopted a different standard for cases arising under the NLRA-preponderance of the evidence, § 10(c), 29 U.S.C. § 160(c). This standard is also required in the limited situations in which private damage suits may be brought for violations of the NLRA, see § 301(e), 29 U.S.C. § 185(e). In all other instances, including those present here, the standard of the Norris-LaGuardia Act stands unmodified. The district court applied the wrong burden of proof and it follows inexorably that its decision must be reversed. We would go further and hold that the evidence was insufficient to warrant a finding of liability under the correct standard.
 
 IV. CONCLUSION
 
 186
 This is not the kind of hard case that ought to lead us into making new law. Section 1985(3) was adopted to provide a federal forum for those who could find no redress in state courts. Today, the majority extend the statute to embrace conduct condemned by state law. State tort law offered adequate redress for the damages. Injunctive relief at private instigation was available in state court. State criminal law has prosecuted the offenders. Federal injunctive relief was obtained by federal administrative intervention. Neither indignation at criminal conduct nor sympathy for its victims should lead us to disregard the Norris-LaGuardia Act or misconstrue § 1985(3). Therefore, we respectfully dissent.
 
 
 187
 R. LANIER ANDERSON, III, Circuit Judge, dissenting:
 
 
 188
 I join Parts I and III of the dissent authored by Judges Rubin and Williams. Having thus concluded that the district court erred in granting the injunction (Part I) and that there is not sufficient evidence to support the judgment when tested under the proper standard of proof (Part III), I find it unnecessary to reach the very difficult issues discussed by Judges Rubin and Williams in Part II. While I probably agree that the evidence in this case did not establish the necessary "class-based, invidiously discriminatory animus," I have reservations concerning the broader implications of Part II of the dissent of Judges Rubin and Williams.
 
 
 189
 GARWOOD, Circuit Judge, dissenting.
 
 
 190
 I respectfully dissent and join in Parts II A ("The Nature of the Right for Which § 1985(3) Provides a Remedy") and II E ("The Constitutional Question: The Source of Congressional Power") of the dissenting opinion authored by Judges Rubin and Williams.
 
 
 191
 In my opinion, the phrase "equal privileges and immunities under the laws" in the first clause of section 1985(3) refers to those rights that the United States Constitution protects against interference by private action (as well as from impairment by state action), such as the right to be free of the badges of slavery as secured by the Thirteenth Amendment and the right to interstate travel. In other words, this phrase applies to rights that have no "state action" requirement. The majority concedes that such rights are not involved here. On the other hand, the phrase "the equal protection of the laws" in the first clause of section 1985(3), repeating verbatim the concluding words of Section 1 of the Fourteenth Amendment, would seem to refer to rights that the United States Constitution protects only against deprivation by some kind of state action or inaction. This is not to say that a private conspiracy cannot deprive a party of the equal protection of the laws; but the object of the conspiracy must be to, "directly or indirectly," in some manner bring about a situation where the protection of the law is unequally afforded or applied to the victim. I believe this construction accords with the wording of the Ku Klux Klan Act, with its title ("An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes"), and with both the operative intent and the constitutional understanding of those in the Forty-Second Congress who supported the Cook-Willard limiting amendment.
 
 
 192
 The overall purpose of this amendment was plainly to prevent the Act from becoming a kind of national tort law and to keep it from transgressing the perceived limitations on the power of Congress. While certainly one method of accomplishing this purpose was the imposition of a class based animus requirement, this was not the only method. The amendment also reflects its proponents' recognition that, with but few exceptions, the rights of citizens are protected by the United States Constitution only against governmental invasion. While with respect to such rights Section 5 of the Fourteenth Amendment was doubtless understood by the proponents of the Cook-Willard amendment as allowing Congress to prohibit private conduct designed to, directly or indirectly, deny the protection thus afforded by the United States Constitution, Section 5 was not understood as allowing Congress to change the ultimate nature of what the United States Constitution protected those rights against, namely governmental misfeasance or nonfeasance. This understanding is reflected, for example, in the remarks of Congressman Burchard, quoted in the opinion of Judges Rubin and Williams, at 1011-1012 supra, that the Act as amended condemned conspiracies
 
 
 193
 "designed to prevent the equal and impartial administration of justice.... The gravamen of the offense is the unlawful attempt to prevent a State through its officers enforcing in behalf of a citizen of the United States his constitutional right to equality of protection."
 
 
 194
 As stated in A Construction of Section 1985(c):[1]
 
 
 195
 "The language of equal protection and equal privileges and immunities was added as a limitation, not as an expansion. The fundamental congressional purpose was to prevent private conspiracies from taking over the government, or from affecting the political environment so as to inhibit state authorities from according equal protection to their citizens." Id. at 436. (Footnote omitted) (emphasis in original.)
 
 
 196
 While section 2 of the Ku Klux Klan Act also prohibits conspiracies "for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws," this clause is distinct from the "for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws" clause in at least two respects. The former clause refers to "all persons within such State," while the latter speaks of "any person or any class of persons." Moreover, the last-quoted clause has the expansive modifier "either directly or indirectly," while the first-quoted clause does not. As pointed out in this connection in A Construction of Section 1985(c):
 
 
 197
 "It would be a mistake to read this legislative intent as limited to direct interference with government provision of equal protection.... The Ku Klux Klan was a political conspiracy; its depredations frequently involved no component of direct obstruction of officials. The Klansmen's object was to seize control of state governments, to reverse the process of reconstruction, and to nullify the rights recently conferred upon the freedmen by the thirteenth, fourteenth, and fifteenth amendments. Their primary weapon was political terror, directed especially against those whose votes and efforts sought to bring about just and impartial state administration. In this way they hoped to make it politically impossible for the states to accord equal protection. The moderates who drafted the statute were careful not to curtail the effect of the general clause of section 2 by words such as 'obstructing a governmental official.' Rather, they employed the phrase 'directly or indirectly' to insure that the statute would reach the schemes of conspirators designed to block equal protection by indirect and political means." Id. at 419-20. (Emphasis in original.)
 
 
 198
 In my opinion this analysis is not contrary to either the holding or the ratio decidendi of Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The views expressed in this dissent are essentially those espoused in the concurring opinion of Justice Stevens, with which Justice Powell agreed, in Great American S. & L. Assn. v. Novotny, 442 U.S. 366, 381, 99 S.Ct. 2345, 2353, 60 L.Ed.2d 957, 969 (1979) (Stevens, J., concurring). See id. at 378, 99 S.Ct. at 2352, 60 L.Ed.2d at 968 (Powell, J., concurring). Neither Justice Stevens nor Justice Powell appear to consider their views in this regard as being at variance with Griffin, nor does the majority opinion in Novotny indicate that these concurrences misread Griffin. Indeed, the statement by the Novotny majority that "(s)ection 1985(c) provides no substantive rights itself," 442 U.S. at 372, 99 S.Ct. at 2349, 60 L.Ed.2d 964, supports the analysis here made, namely that the Forty-Second Congress designed the Ku Klux Klan Act to guard against subversion of those rights secured to citizens by the United States Constitution. It did not create new substantive rights.
 
 
 199
 Moreover, I believe the appropriate reading of Griffin is that stated as follows in A Construction of Section 1985(c):"The Court's decision that the acts alleged in Griffin stated a section 1985(c) cause of action accords with the original purpose of the statute. The defendants in Griffin assaulted the plaintiffs on the highway on the mistaken impression that the driver was a civil rights worker. There was no hint of state action in any of the three possible forms: no state officers were involved by action or inaction, no state authorities were coerced, influenced, or impeded in the performance of their duty toward the plaintiffs, and no conspiracy existed so massive as to supplant state authority. Nevertheless, the purpose of the defendants was in part to drive civil rights workers from the state, and thereby to make it less likely politically that the state would carry out its duty of equal protection to blacks. This purpose falls squarely within the scope of conspiratorial designs that prompted the Forty-Second Congress to pass the Ku Klux Klan Act.
 
 
 200
 "....
 
 
 201
 "... The Court's holding does not suggest that conspiracies of a wholly different purpose and effect from those motivating the framers of the statute-for example, private acts of discrimination in employment-are also within the statute's reach. The Griffin Court insisted as much by expressly recognizing the necessity of 'giving full effect to the congressional purpose' by restricting the scope of the action in the manner intended by the sponsors of the 'limiting amendment.' In order to decide the Griffin case, it was not necessary to explore the full extent of the limiting amendment-the requirement of discriminatory animus sufficed for Griffin's purposes-but the opinion endorses, in principle, the restriction of section 1985(c) in accordance with its extensive legislative history." Id. at 425-27. (Footnotes omitted) (emphasis in original.)
 
 
 202
 In this case there is not only no evidence that these defendants had the purpose of denying plaintiffs any of those rights that the United States Constitution secures against private (or public) abridgement (such as the right to be free of the badges of slavery or to travel interstate), but there is also no evidence of any purpose to directly or indirectly deny plaintiffs the protection of any laws. There not only was no direct interference with law enforcement, there was no suggestion that defendants were attempting to prevent plaintiffs from exercising or achieving any political influence or governmental power or to create a climate of opinion or situation in which governmental authorities would be unwilling or unable either to protect plaintiffs in the exercise of their legal rights or to afford plaintiffs equal governmental treatment or protection.
 
 
 203
 Nor, in my view, has there been any showing of the requisite class based animus. While I agree with the majority that a purely racial animus is not the only class based animus reached by the Ku Klux Klan Act, I nevertheless believe that the animus reflected in this case is far removed from that which the Act intended to protect against. As one of the above-quoted passages from A Construction of Section 1985(c) correctly observes:
 
 
 204
 "The Klansmen's object was to seize control of state governments, to reverse the process of reconstruction, and to nullify the rights recently conferred upon the freedmen by the thirteenth, fourteenth and fifteenth amendments. Their primary weapon was political terror, directed especially against those whose votes and efforts sought to bring about just and impartial state administration."
 
 
 205
 The Ku Klux Klan Act, of course, was designed to combat such phenomena. Consistent with this evident design, I would require that the animus, whether directed at individuals or a class, be related in some manner to race (or perhaps some other analogously immutable class characteristic). Under this theory, the Act would also extend to those harmed either because of their actual or perceived, present or potential, allegiance with a discriminated-against race (or similar class) or because of their efforts to secure on behalf of such race (or similar class) the rights which the United States Constitution guarantees against governmental denial on account of race (or similar characteristic) or the rights, such as freedom from the badges of slavery, which the United States Constitution protects against private infringement.
 
 
 206
 I do not denigrate the right of individuals not to belong to unions, nor do I suggest that the right to work on a job not restricted to union members is unworthy of protection against unlawful interference. And, I cannot accept the proposition that there has been no significant discrimination or violence against nonunion workers. But it is plain to me that this was not the sort of discriminatory deprivation of rights that the Ku Klux Klan Act was designed to prevent.
 
 
 207
 I also agree with Judges Rubin and Williams that, for the reasons stated by them, the majority errs in its reliance on the commerce clause as a source of congressional power to enact the Ku Klux Klan Act, so as to reach purely private conspiracies directed at purely private ends unrelated to rights protected by the United States Constitution. Such reliance at least indirectly undermines the majority's reading of congressional intent concerning the scope of section 1985(3). At the very least, reliance on the commerce clause bespeaks a serious doubt as to the existence of any other source of congressional power sufficient to support the Ku Klux Klan Act as interpreted by the majority. We are cited to no legislative history, or other contemporary evidence, that Congress intended to invoke its power under the commerce clause, and it is beyond dispute that congressional power under this clause was then considered far more limited than it is today. Accordingly, since Congress did not purport to act under the commerce clause and yet considered it was acting constitutionally, a strong inference arises that Congress did not intend the Ku Klux Klan Act to have the broad reach ascribed to it by the majority.
 
 
 208
 Moreover, we are cited to no decision of the Supreme Court that has sustained under the commerce clause an act of Congress not by its terms directed at interstate or foreign commerce, or matters affecting them, or expressly stated to be enacted pursuant to the power to regulate commerce. To do so when the legislative history, and other contemporary evidence, plainly indicate that Congress was relying on other constitutional sources of power, seems to me to be a most serious error. To regulate only conduct in or affecting interstate commerce is quite a different proposition from regulating conduct irrespective of its relation to interstate commerce. Under Section 8 of Article I, it is Congress, not the courts, that is given the "power" "to regulate commerce." When the courts "sustain" under the commerce clause an act of Congress plainly not intended as an exercise of the power to regulate commerce, an act not limited to conduct in or affecting commerce but rather applying equally to conduct within and without the scope of the commerce power, then the courts have made the decision, which the Constitution committed to Congress, to regulate interstate commerce. The majority relies on Chief Justice Marshall's classic formulation in McCulloch v. Maryland, 4 Wheat 316, 421, 4 L.Ed. 579, 605 (1819), but overlooks the import of the opening phrases, "Let the end be legitimate, let it be within the scope of the constitution...." Here, the "end" which Congress sought to achieve was not the regulation of commerce. It stands McCulloch v. Maryland on its head to say that an "end" not intended by Congress, and which Congress was not required to intend, can be used to sustain, and in sustaining to transform, an act of Congress taken in the exercise of distinctly different constitutional powers.
 
 
 209
 Concluding, for the above-referenced reasons, that plaintiffs have no cause of action under 42 U.S.C. § 1985(3), I find it unnecessary to reach the other issues addressed in the majority opinion and in the dissent of Judges Rubin and Williams.
 
 
 
 *
 Former Fifth Circuit case, section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 The district court assessed damages against the following eleven unions: Laborers International Union of North America, Local 870; Operative Plasters and Cement Masons International Association, Local 884; United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 195; United Brotherhood of Carpenters and Joiners of America, Local 610; United Brotherhood of Carpenters and Joiners of America, Local 753; International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers, AFL-CIO, Local 587; International Association of Bridge Structural and Ornamental Ironworkers, Local 125; Sheet Metal Workers International Association, Local 196; Carpenters District Council of Sabine Area; International Brotherhood of Electrical Workers, Local 479; and International Union of Operating Engineers, Hoisting and Portable Engineers, AFL-CIO, Local 450
 
 
 [2]
 Section 104 provides as follows:
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
 (b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;
 (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
 (d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
 (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
 (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
 (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
 (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.
 29 U.S.C. § 104.
 
 
 [3]
 Even where jurisdiction to grant injunctive relief is authorized, the Norris-LaGuardia Act imposes strict procedural requirements upon the court. See 29 U.S.C. §§ 107-109; New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 561-62, 58 S.Ct. 703, 707, 82 L.Ed. 1012, 1016 (1938). Section 107 provides that no federal court shall have jurisdiction to issue a "permanent injunction in any case involving or growing out of a labor dispute" except after hearing testimony in open court and after making certain findings of fact. The district court must find: i) that the danger to the complainant is imminent; ii) that the defendant's acts will result in irreparable injury; iii) that, as to each item of relief sought, the harm to the complainant if relief were denied outweighs the harm to the defendant if relief were granted; iv) that there is no adequate remedy at law; and v) that the officials charged with protecting the complainant are either unwilling or unable to do so. See 29 U.S.C. § 107
 The district court in the case at bar issued a permanent injunction without specifically making these five findings; however, the defendants have not objected to the district court's failure to do so. Although this court will normally not consider an issue which a party fails to raise on appeal, a federal court is under an independent obligation to determine whether it has jurisdiction to decide a claim. See Pettinelli v. Danzig, 644 F.2d 1160, 1161 (5th Cir. 1981). Because the findings required by section 107 are arguably a jurisdictional prerequisite to the issuance of an injunction in a labor dispute, the defendant's failure to raise this question on appeal does not dispose of the issue. We need not decide, however, whether the district court's failure to make the requisite findings deprived it of jurisdiction. Even assuming that these findings are a jurisdictional prerequisite to the issuance of an injunction, they are required only in cases "involving or growing out of a labor dispute." As we discuss below, this case does not involve a labor dispute within the meaning of the Norris-LaGuardia Act. Thus, the absence of a labor dispute renders an inquiry into the jurisdictional nature of the section 107 findings unnecessary.
 
 
 [4]
 The relevant part of section 1985(3) reads as follows:
 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 42 U.S.C. § 1985(3).
 
 
 [5]
 Dowling recognizes that there is no statutory requirement of state participation or support for the conduct of the conspirators, i.e., that there is no requirement that the defendants act under color of state law. However, where one suffers a deprivation of a federally created right which necessarily includes some component of state action, Dowling holds that such state action is also a necessary ingredient of the section 1985(3) cause of action. See 459 F.2d at 194-95
 
 
 [6]
 Technically, of course, this language is dicta. Griffin grounded its decision on the rights secured to black citizens under the Thirteenth Amendment and the right to interstate travel, both of which operate as limits on individual conduct as well as state conduct. However, we believe that the language and reasoning of Griffin on this issue are sufficiently indicative of the Supreme Court's approach to be regarded as dispositive
 
 
 [7]
 Because of our disposition of the case, it is not necessary to decide whether section 1985(3) also protects against private conspiracies to deny rights secured under state law. See Life Insurance Company of North America v. Reichardt, 591 F.2d 499 (9th Cir. 1979) (holding violations of state antidiscrimination statute cognizable). It is also unnecessary to decide whether federal statutory rights are protected by § 1985(3). See Novotny v. Great American Federal Savings & Loan Ass'n, 584 F.2d 1235 (3d Cir. 1978), rev'd, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (violations of Title VII). Cf. McLellan, 545 F.2d 919 (5th Cir. 1977) (right to file bankruptcy petition not protected.)
 
 
 [8]
 Our reliance upon the factors deemed relevant in McLellan does not necessarily imply that they are the only relevant considerations. Conceivably, other factors may be regarded as sufficient to include or to exclude other classes from § 1985(3) coverage
 
 
 [9]
 See, e.g., Cong. Globe, 42d Cong., 1st Sess. 252 (remarks of Sen. Morton) ("(t)he purpose (of the Klan) is by these innumerable and nameless crimes to drive those who are supporting the Republican party to abandon their political faith or to flee the State."); id. at 504 (remarks of Sen. Pratt) (the primary purpose of the Klan "is to punish men for their political opinions"); id. at 702 (remarks of Sen. Edmunds) (the "systematic plan (of the Klan) is not to leave in any of those States a brave white man who dares to be a Republican or a colored man who dares to be a voter")
 
 
 [10]
 See, e.g., Cong. Globe, 42d Cong., 1st Sess. 72 (remarks of Rep. Blair) (the Klansmen "murder for a difference in political opinions"); id. at 333 (remarks of Rep. Hoar) (the Klan is a "secret political conspiracy"); id. at 391 (remarks of Rep. Elliott) ("the design of the Ku Klux is political"); id. at 488 (remarks of Rep. Lansing) ("the Ku Klux in their crimes are inspired by political zeal")
 
 
 [11]
 The plaintiffs argue that Congress also intended to extend protection to workers. They note particularly Senator Freylinghausen's concern for the rights of northern laborers migrating south:
 The journeyman cobbler of New England may wrap his awl and wax and last in his leather apron and stand in Charleston, or New Orleans, or Savannah, and say "Here I will settle in despite of the constitution and of the laws of these States; and I have a right to invoke the power of the nation here to protect me." The mason or carpenter of New Jersey may put his chisels or his trowels in his carpet-bag, and go to any part of this land and say, "Here I will stay in despite of the holy horror of those who cry out," "Adventurer!" "Scalawag!" "Carpet-bagger!"
 Cong. Globe, 42d Cong., 1st Sess. 500 (1871). Although this, and other remarks noted by the plaintiffs, do express Congress' intent to protect northern laborers, we discount their importance to the case at bar for two reasons. First, because these remarks occur only sporadically throughout the legislative history, they do not appear to reflect a major concern of the 42d Congress. Second, the hostility directed toward the carpetbaggers appears to have arisen because of the carpetbaggers' association with the policies of Reconstruction, not because of any economic association. Their status as workers appears to have been merely incidental to the hostility they experienced and to Congress' concern.
 
 
 [12]
 Novotny held that a right created by Title VII could not be asserted under section 1985(3). To do so would allow a litigant to bypass the statutory plan, particularly the administrative process, created by Congress. See 442 U.S. at 375-76, 99 S.Ct. at 2350-51. Because the litigants here have not attempted to assert a right created by the National Labor Relations Act, the concerns expressed in Novotny are inapposite to this case
 
 
 [13]
 It should be observed that the National Labor Relations Board has a long-established policy against awarding monetary damages for physical injury and property damage caused by strike or picket line violence for which the union is held responsible. See Union de Tronquistas Local 901 (Lock Joint Pipe & Co.), 202 N.L.R.B. 399 (1973); R. Gorman, Basic Text on Labor Law 217 (1976); D. McDowell & K. Huhn, NLRB Remedies for Unfair Labor Practices 99-100 (1976). The Board's refusal to give damage awards is predicated in part upon its view that such awards would unduly interfere with the policy of the National Labor Relations Act to protect concerted activities and that other remedies against union violence are sufficient deterrent. Union de Tronquistas, 202 N.L.R.B. at 400. Its practice is also grounded in concern for the proper institutional role to be played by the Board. See District 1199, National Union of Hospital and Health Care Employees (Frances Scherver Home and Hospital), 345 N.L.R.B. 105 (1979) (Board is not equipped to handle personal injury claims); Union Nacional de Trabajadores, 219 N.L.R.B. 157 (1975) (awards are punitive and, therefore, not part of the Board's statutory function)
 Whatever the basis for the Board's refusal to order compensation for injuries suffered during strike or picket line violence, our decision that section 1985(3) affords a remedy in this case does not offend that policy. In this case, no lawful concerted activity was taking place when the Cross construction site was attacked. There was no organizational campaign, no union demand for recognition, no informational picket, and no collective bargaining in progress. In such circumstances, a civil remedy for damages presents no danger of thwarting the Board's policy. However, whether section 1985(3) should also extend to other conspiracies against nonunion workers and their employers is a question which we expressly pretermit.
 
 
 [14]
 In Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association, --- U.S. ----, 102 S.Ct. ----, 72 L.Ed.2d ----, 50 U.S.L.W. 4789 (U.S. June 24, 1982), the Supreme Court considered whether a politically motivated strike was a "labor dispute" within the meaning of the Norris-LaGuardia Act. Two controversies were involved: a political strike and a dispute over whether that strike was barred by the no-strike pledge in the collective bargaining contract. The dispute over the no-strike clause was held to be sufficient to bring the employees' actions within the protections of the Norris-LaGuardia Act. See id. at ----, 102 S.Ct. at ----. In the case before us there was no strike and no underlying collective bargaining contract dispute. The holding of Jacksonville Bulk Terminals does not affect our holding today
 The Court noted that even if the dispute over the contract term were absent, this controversy might still be a "labor dispute." The Court reasoned that the union's political "objections were expressed in a work stoppage by employees against their employer, which focused on particular work assignments." Id. at ---- n.12, 102 S.Ct. at ---- n.12. Thus, the test for determining a labor dispute, whether the employer-employee relationship is the matrix of the controversy, might have been satisfied. See id. However, the Court also noted the continuing viability of Columbia River Packers Association v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750. It found that Hinton stood for the proposition "that the protections of (the Norris-LaGuardia Act) do not extend to labor organizations when they cease to act as labor groups or when they enter into illegal combinations with nonlabor groups in restraint of trade." Jacksonville Bulk Terminals v. International Longshoremen's Association, ---- U.S. at ----, 102 S.Ct. at ----. The broad scope of the Norris-LaGuardia Act does have limits. In the case at bar, those limits were exceeded. The defendants were not acting as labor groups. Instead, they sought to dominate "their" territory through force and violence.
 
 
 [15]
 The minutes show that the "good and welfare" of the community were discussed
 
 
 [1]
 James Matthews did not testify at trial, nor was he deposed by any party. The district court, however, awarded him $5,000 in damages from the defendant labor unions. A. A. Cross stated in a post-trial deposition that, after the January 17 incident, he decided to maintain Cross Construction's records in Houston and accordingly paid Matthews's Houston hotel bill while Matthews worked there on the company's recordkeeping. Cross further testified that Matthews had been threatened several times after the January 17 incident, was subsequently fired from Cross Construction for cause, and that he did not know Matthews's current whereabouts. Paul Scott stated in his deposition that, to the best of his knowledge, Matthews was in New York
 
 
 [2]
 When the Labor Management Relations (Taft-Hartley) Act of 1947 was passed, there was concern that the power given to the National Labor Relations Board to obtain injunctions in labor disputes and to issue cease and desist orders was a limitation upon the Norris-LaGuardia Act. The Taft-Hartley Act did indeed curtail the Norris-LaGuardia Act, but it was carefully written to ensure that no increased power to obtain labor injunctions was placed in the hands of private litigants. The labor injunctions and cease and desist orders authorized by the Taft-Hartley Act against unions and their members must be initiated and controlled by the government. Senator Smith, who was handling the debate on the Taft-Hartley Act on the floor of the Senate on behalf of its proponents, was asked if the Taft-Hartley Act would not "slice a wedge" from the Norris-LaGuardia Act on injunctions. His reply was "we were very careful in this bill to protect the injunctive process as it is protected in the Norris-LaGuardia Act, except in the exceptional cases where the Government has to step in." Cong.Rec. 4,411 (April 30, 1947) (emphasis added)
 The Supreme Court later commented:
 The short answer to the argument that the Labor Management Relations Act of 1947 ... has removed the limitations of the Norris-LaGuardia Act upon the power to issue injunctions against what are known as secondary boycotts, is that the law has been changed only where an injunction is sought by the National Labor Relations Board, not where proceedings are instituted by a private party.
 Bakery Sales Drivers Local 33 v. Wagshal, 333 U.S. 437, 442, 68 S.Ct. 630, 632, 92 L.Ed. 792, 796 (1948).
 
 
 [3]
 No court has jurisdiction to issue an injunction growing out of a labor dispute to prohibit any persons from doing any of the following:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
 (b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in (section 3 of this Act);
 (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
 (d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
 (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
 (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
 (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
 (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in (section 3 of this Act).
 29 U.S.C. § 104.
 
 
 [4]
 Lauf v. E. G. Shinner & Co., 303 U.S. 323, 329-30, 58 S.Ct. 578, 581-82, 82 L.Ed. 872, 877 (1938) ("The District Court made none of the required (§ 107) findings save as to irreparable injury and lack of remedy at law. It follows that in issuing the injunction it exceeded its jurisdiction.")
 
 
 [5]
 As the majority reports: "Cross did not have a collective bargaining agreement with any labor union." Pages 982-983 supra
 
 
 [6]
 E.g., United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (Court found there was a labor dispute even though members of the United Mine Workers forcibly prevented the opening of a mine staffed by members of a rival union organization, threatened the employer, and beat an organizer for the rival union; mine was finally reopened when UMW miners were hired.); Milk Wagon Drivers' Local 753 v. Lake Valley Farm Prods., Inc., 311 U.S. 91, 96, 61 S.Ct. 122, 124, 85 L.Ed. 63, 66 (1940) (union organizing drive was acrimonious and frequently violent: "store windows were broken, personal altercations occurred, charges and countercharges were frequent, arrests were made and court proceedings instituted"; nevertheless the Court found that a labor dispute existed); Lake Charles Stevedores, Inc. v. Mayo, 20 F.Supp. 698 (W.D.La.1935) (union, striking to gain recognition, engaged in a pitched battle, including gunfire, with private armed guards brought in by port authorities; district court granted an injunction, but only after specific findings that the requirements of § 107 were satisfied.); see also Gregory & Katz, Labor and the Law 190 (3d ed. 1979) ("Congress did not give organized labor a complete carte blanche." Labor activities after the passage of the Norris-LaGuardia Act were "still subject to other legal procedures such as criminal proceedings and actions for damages, where appropriate.")
 
 
 [7]
 Whether the defendants' activities were otherwise "legitimate" depends only on whether the local unions were in compliance with the technical requirements for organizational activity under the National Labor Relations Act. Concededly, they were not. But it is not essential to the existence of a labor dispute that the contest be connected with "legitimate" labor activity or that it be peaceful
 
 
 [8]
 See California Ass'n of Employers v. Building & Constr. Trades Council, 178 F.2d 175 (9th Cir. 1949) (holding that the controversy involved a labor dispute although the union was insisting on a closed shop and closed shops had previously been outlawed by the Taft-Hartley Act)
 
 
 [9]
 See also Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960). A union picketed a foreign ship that employed foreign seamen and paid them less than the going American wage rates. The foreign employees had no dispute with the vessel owners, and the unions had no desire to organize or to represent the foreign employees. The Supreme Court held, however, that the Norris-LaGuardia Act applied, finding that the picketing related to the terms and conditions of employment
 
 
 [10]
 NLRB v. Sabine Area Bldg. & Constr. Trades Council, No. 75-2481 (5th Cir. June 24, 1975)
 
 
 [11]
 The Supreme Court has noted that "Congress made the definition (of " labor dispute" in the Norris-LaGuardia Act) broad because it wanted it to be broad. There are few pieces of legislation where the congressional hearings, committee reports, and the language in the legislation itself more clearly point to the necessity for giving an Act a construction that will protect the congressional policy the Act adopted." Order of R. R. Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 335, 80 S.Ct. 761, 764, 4 L.Ed.2d 774, 779 (1960)
 
 
 [12]
 National Maritime Union of Am. v. NLRB, 342 F.2d 538, 541 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965)
 
 
 [13]
 As stated above, the court must find prior to issuing an injunction, that "unlawful acts have been threatened and will be committed ... or have been committed and will be continued." 29 U.S.C. § 107(a) (emphasis added)
 
 
 [14]
 42 U.S.C. § 1985(3) provides in full:
 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 [15]
 "That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." Griffin, 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347. See also Cong. Globe, 42d Cong., 1st Sess. 485 (1871) (remarks of Rep. Cook addressing Rep. Shellabarger's amendment to the original proposed Act):
 I think it is within the power of Congress to protect and enforce every right secured to American citizens by the Constitution of the United States. I do not believe, and I do not know of any man who does believe, ... that Congress has a right to punish an assault and battery when committed by two or more persons within a State. I know of no one who believes that Congress has any right to enforce the laws of a State except in the emergency contemplated in the Constitution, when the State may be unable to do so by reason of lawless combination too strong for the State authorities to suppress. The statement that this bill aims at any such end is an utter misstatement of its object and effect.
 
 
 [16]
 See generally 1 Statutory History of the United States 591-656 (B. Schwartz ed. 1970); Avins, The Ku Klux Klan Act of 1871: Some Reflected Light on State Action and the Fourteenth Amendment, 11 St. Louis U.L.J. 331 (1967)
 Section 1985(c) was renumbered § 1985(3). 42 U.S.C. § 1985(3) (Supp. III 1979).
 
 
 [17]
 See Comment, A Construction of Section 1985(c) in Light of Its Original Purpose, 46 U.Chi.L.Rev. 402, 408 n.32 (1979) (hereinafter cited as A Construction of Section 1985(c) )
 
 
 [18]
 Id. at 403
 
 
 [19]
 A Construction of Section 1985(c), supra note 17, at 407 n.29, (citing K. Stampp, The Era of Reconstruction 199 (1965))
 
 
 [20]
 Cong.Globe, 42d Cong., 1st Sess. 116-17 (1871); id. at 180-82
 
 
 [21]
 Id. at 653, col. 3 (The Klan's "well-defined and clearly-proven object is to gain political control by intimidation and murder.") (remarks of Sen. Osborn (R-Fla.)); id. at 484, col. 1 (The "purpose of all this bloody work ... is for the express purpose of controlling government in the states where these things are done, by preventing citizens from exercising their legitimate constitutional privileges.") (remarks of Rep. Wilson (R-Ind.))
 
 
 [22]
 See id. at 517, col. 2 ("the minority of the committee reach the same conclusion as the majority reach as to the fact that the disorders have a political origin and purpose, the difference being, in substance, that the majority find it to originate in an aim at the overthrow of the reconstruction laws and the people and State governments they were designed to protect, while the minority seem to conclude that the violence is natural and just in resistance of wicked laws") (remarks of Rep. Shellabarger (R-Ohio))
 
 
 [23]
 Id. at 386, col. 2 (remarks of Rep. Lewis (D-Ky.)). See also additional references in A Construction of § 1985(c), supra note 17, at 408-09 & n.32
 
 
 [24]
 Cong.Globe, 42d Cong., 1st Sess. 68 app. (1871)
 
 
 [25]
 A Construction of Section 1985(c), supra note 17, at 415, and authorities cited therein. See generally id. at 411-17
 
 
 [26]
 Id. at 415-16, and authorities cited therein
 
 
 [27]
 Id. at 417
 
 
 [28]
 Cong.Globe, 42d Cong., 1st Sess. 477, col. 3 (1871) (emphasis added)
 
 
 [29]
 Id. As one commentator has noted: "This addition of remedy was not a subject of congressional discussion or debate. It was presumably inspired at least in part by concern for the victims of acts of terror or indirect subversion committed to inhibit the exercise of the rights of citizens." A Construction of Section 1985(c), supra note 17, at 417
 
 
 [30]
 Cong.Globe, 42d Cong., 1st Sess. 188 app., col. 2 (1871)
 
 
 [31]
 Id. at 315 app., col. 2
 
 
 [32]
 Id. at 478, col. 2 ("The object of the amendment is ... to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of remedies of this section.") (remarks of Rep. Shellabarger); id. at 486, col. 3 (remarks of Rep. Cook (R-Ill.)); id. at 514, col. 3 (remarks of Rep. Poland (R-Vt.))
 
 
 [33]
 See A Construction of Section 1985(c), supra note 17, at 437 ("The enacting Congress did not intend the statute to be an antidiscrimination law. The language of equal protection and equal privileges and immunities was added as a limitation, not as an expansion.")
 This is the interpretation of § 1985(3) that we adopted in McClellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir. 1977) (en banc). Turning first to what private action constitutes a deprivation of the protection of the laws, we held that "the inquiry must initially concentrate on the legality of the defendants' activity apart from section 1985(3). If the object of the defendants' conspiracy did not include a violation of some law (independent of section 1985(3) itself) which protects the plaintiff, the conspiracy could not have deprived the plaintiff of the 'protection of the laws.' " Id. at 925. We then turned to the requirement that the deprivation be of the equal protection of the laws, and held that violation of equality is a separate component of the action although we declined to decide whether the section extends to other bias than racial. Id. at 929.
 Section 1985(3) also prohibits conspiracies "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." Although § 1985(3) claims do not typically allege that state authorities are "unwilling or unable to provide protection," the language of the statute, allows it to reach "indirect efforts to thwart equal protection." A Construction of Section 1985(c), supra note 17, at 420.
 
 
 [34]
 Some courts have held that § 1985(3) covers violations of federal statutory rights. E.g., Hodgin v. Jefferson, 447 F.Supp. 804 (D.Md.1978) (claims based on § 3 of the Equal Pay Act); Broadcast Employees v. International Bhd. of Teamsters, 419 F.Supp. 263 (E.D.Pa.1976) (conspiracy to violate Labor Management Reporting and Disclosure Act), aff'd in part and reversed in part on other grounds, 614 F.2d 846 (3d Cir. 1980); Milner v. National School of Health Technology, 409 F.Supp. 1389 (E.D.Pa.1976)
 In Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 370 n.6, 99 S.Ct. 2345, 2348 n.6, 60 L.Ed.2d 957, 962 n.6 (1979), however, the Supreme Court specifically declined to decide "whether § 1985(3) creates a remedy for statutory rights other than those fundamental rights derived from the Constitution." Justice Powell suggested in his concurring opinion that the statute's "reach is limited to conspiracies to violate those fundamental rights derived from the Constitution." Id. at 378, 99 S.Ct. at 2352, 60 L.Ed.2d at 967. Justice Stevens went further and said, "I do not believe that (§ 1985(3) ) was intended to provide a remedy for the violation of statutory rights-let alone rights created by statutes that had not yet been enacted." Id. at 385, 99 S.Ct. at 2355, 60 L.Ed.2d at 971 (concurring opinion). Justices White, Brennan, and Marshall expressed the opposite view in their dissenting opinion: "(Section) 1985(3) encompasses all rights guaranteed in federal statutes as well as rights guaranteed directly by the Constitution." Id. at 384 n.5, 99 S.Ct. at 2357 n.5, 60 L.Ed.2d at 971 n.5; cf. Note, Private Conspiracies to Violate Civil Rights: The Scope of Section 1985(3) After Great American Federal Savings & Loan Association v. Novotny, 61 B.U.L.Rev. 1007, 1028-33 (1981) (arguing that § 1985(3) should be applied "only to statutes whose primary purpose is to guarantee equal treatment").
 Some courts have also held that "(v)iolations of state conferred rights and privileges are sufficient to constitute a deprivation of 'equal protection of the laws.' " Life Ins. Co. of N. Am. v. Reichardt, 591 F.2d 499, 504-05 (9th Cir. 1979) (violation of California's Civil Rights Act) (decided before Novotny); accord, Harrison v. Brooks, 446 F.2d 404 (1st Cir. 1971) (zoning law infringement). The Supreme Court suggested in Novotny, however, that a denial of rights under state laws may not be covered under § 1985(3) unless independently unconstitutional. See 442 U.S. at 377, 99 S.Ct. at 2351, 60 L.Ed.2d at 966 (§ 1985(3) provides "a civil cause of action when some otherwise defined federal right-to equal protection of the laws or equal privileges and immunities under the laws-is breached by a conspiracy in the manner defined by the section") (emphasis added).
 
 
 [35]
 Griffin arose out of the dismissal of a complaint for failure to state a cause of action
 
 
 [36]
 Novotny held that § 1985(3) could not be invoked to redress violations of Title VII. Rights created by the Equal Employment Opportunity Act could not "be asserted within the remedial framework of § 1985(3)" because Title VII provided its own remedial apparatus. 442 U.S. at 377, 99 S.Ct. at 2351, 60 L.Ed.2d at 966; cf. Note, supra note 34, at 1019-21 (arguing that § 1985(3) is "neither purely remedial nor purely substantive, but rather a mixture")
 
 
 [37]
 In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court held that there was a federal cause of action for damages under the fourth amendment upon proof of damages resulting from violations of that amendment by federal agents acting under color of federal authority
 
 
 [38]
 We, therefore, agree with the Fourth Circuit's refusal to recognize a § 1985(3) cause of action for private interference with the "associational right" of belonging to the Ku Klux Klan. Bellamy v. Mason's Stores, Inc., 508 F.2d 504 (4th Cir. 1974). This holding is correct, in part, because the right of association derives from the first amendment-itself framed as a prohibition against the federal government and not against private persons. A number of other courts have declined to extend § 1985(3) protection to infringements of all constitutional rights
 First amendment :
 Murphy v. Mount Carmel High School, 543 F.2d 1189 (7th Cir. 1976).
 Sex discrimination :
 Doski v. M. Goldseker Co., 539 F.2d 1326 (4th Cir. 1976) (employment); Cohen v. Illinois Inst. of Technology, 524 F.2d 818 (7th Cir. 1975) (employment), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976).
 Procedural due process :
 Briscoe v. Bock, 540 F.2d 392 (8th Cir. 1976); Collins v. Bensinger, 374 F.Supp. 273 (N.D.Ill.) (recognizing that § 1985(3) refers only to equal protection and not due process), aff'd mem., 506 F.2d 1405 (7th Cir. 1974), cert. denied, 422 U.S. 1058, 95 S.Ct. 2683, 45 L.Ed.2d 710 (1975).
 Other courts, however, have held that § 1985(3) reaches every private conspiracy that Congress has power to forbid. E.g., Means v. Wilson, 522 F.2d 833 (8th Cir. 1975) (interference with right to vote in tribal elections), cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); Weise v. Syracuse Univ., 522 F.2d 397 (2d Cir. 1975) (employment discrimination); Cameron v. Brock, 473 F.2d 608 (6th Cir. 1973) (free speech; distribution of campaign material); Action v. Gannon, 450 F.2d 1227 (8th Cir. 1971) (en banc) (free exercise of religion); Richardson v. Miller, 446 F.2d 1247 (3d Cir. 1971) (freedom of expression).
 
 
 [39]
 29 U.S.C. § 164(b) ("Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.")
 Texas' Right to Work Law prohibits the denial of employment to anyone because of a failure to pay "any fee, assessment, or sum of money whatsoever" to a union. Tex.Rev.Civ.Stat.Ann. art. 5154a(8a) (Vernon 1971).
 
 
 [40]
 L. Tribe, American Constitutional Law § 12-23, at 702 (1978) (emphasis and footnotes omitted)
 
 
 [41]
 Pages 991-992 supra
 
 
 [42]
 Page 994 supra (emphasis added)
 
 
 [43]
 Cross Construction hired the workers they needed without inquiring as to their union affiliation. In fact, some of the Cross Construction employees did belong to unions
 
 
 [44]
 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 (1971)
 
 
 [45]
 As the majority opinion points out, other circuits have also extended § 1985(3) to cover non-racial classes. Page 991 supra
 
 
 [46]
 See generally Note, The Class-Based Animus Requirement of 42 U.S.C. § 1985(c): A Suggested Approach, 64 Minn.L.Rev. 635 (1980)
 
 
 [47]
 We note that in their amended complaint, the plaintiffs purported to represent a class of persons composed of four categories or sub-classes of plaintiffs consisting of:
 (a) All persons presently employed by A. A. Cross Construction Company, Inc. (hereinafter called "Cross"), their wives and children;
 (b) All persons, together with their wives and children, who may become employed by Cross and perform work leading to construction of the Alligator Bayou Pump Station on the hurricane protection levee along Taylor's Bayou near Port Arthur, Jefferson County, Texas;
 (c) All persons, their wives and children, and all firms and corporations who may supply, deliver, or provide labor, materials, goods or services to Cross or others for construction of the Alligator Bayou Pump Station;
 (d) All persons, their wives and children, who may lawfully be present upon the site of the Alligator Bayou Pump Station, or the ways leading thereto.
 Interestingly, we found no indication, in our examination of the record, of any attempt to have the class certified. Final judgment, therefore, was rendered only on behalf of the named plaintiffs.
 
 
 [48]
 DeSantis v. Pacific Tel. & Tel. Co., 608 F.2d 327 (9th Cir. 1979)
 
 
 [49]
 Carchman v. Korman Corp., 594 F.2d 354 (3d Cir.), cert. denied, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979)
 
 
 [50]
 Lessman v. McCormick, 591 F.2d 605 (10th Cir. 1979)
 
 
 [51]
 McLellan v. Mississippi Power & Light Co., 545 F.2d 919 (5th Cir. 1977) (en banc)
 
 
 [52]
 Bricker v. Crane, 468 F.2d 1228 (1st Cir. 1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973)
 
 
 [53]
 Kimble v. D. J. McDuffy, Inc., 648 F.2d 340 (5th Cir. 1981) (en banc), cert. denied, --- U.S. ----, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981)
 
 
 [54]
 Arnold v. Tiffany, 487 F.2d 216 (9th Cir. 1973), cert. denied, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974)
 
 
 [55]
 McLellan, 545 F.2d at 932-33
 
 
 [56]
 Compare pages 995-996 supra with the panel opinion, Scott v. Moore, 640 F.2d 708, 718 (1981) (the class composed of "nonunion workers and their employers ... falls within the statute's protective ambit")
 
 
 [57]
 Pages 995-996 supra
 
 
 [58]
 Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 720-21 (9th Cir.) ("The law of this circuit is clear: the plaintiff must be a member of the class discriminated against to claim the benefits of § 1985(3)."), cert. denied, --- U.S. ----, 102 S.Ct. 510, 70 L.Ed.2d 383 (1981); Briley v. California, 564 F.2d 849, 858-59 (9th Cir. 1977); Lopez v. Arrowhead Ranches, 523 F.2d 924, 927 (9th Cir. 1975)
 
 
 [59]
 Novotny, a male, was a loan officer and member of the Savings and Loan Association's Board of Directors. He alleged that when he "expressed support for the female employees at a meeting of the board of directors, his connection with the Association abruptly ended." 442 U.S. at 370, 99 S.Ct. at 2347, 60 L.Ed.2d at 962. The en banc court of appeals for the Third Circuit held that Novotny was injured as a result of the conspiracy motivated by an invidious animus against women and had standing to bring suit under § 1985(c). 584 F.2d 1235, 1244-45 (3d Cir. 1978) (en banc). The Supreme Court majority did not, however, address this issue
 Justice White in his dissent stated: "Because § 1985(3) provides a remedy for any person injured as a result of deprivation of a substantive federal right, it must be seen as itself creating rights in persons other than those to whom the underlying federal right extends." 442 U.S. at 390, 99 S.Ct. at 2358, 60 L.Ed.2d at 975.
 
 
 [60]
 Griffin v. Breckenridge, 403 U.S. at 104, 91 S.Ct. at 1799, 29 L.Ed.2d at 349
 
 
 [61]
 Page 996 supra
 
 
 [62]
 Page 997 supra; see Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J. 1353, 1359 (1964); Wildman, 42 U.S.C. § 1985(3)-A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved, 17 San Diego L.Rev. 317 (1980); A Construction of Section 1985(3), supra note 17, at 440; Note, The Troubled Waters of Section 1985(3) Litigation, 1973 Law & Soc.Ord. 639; Comment, Private Conspiracies to Violate Civil Rights, 90 Harv.L.Rev. 1721, 1722 n.11 (1977). But see Note, Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments, 74 Colum.L.Rev. 449, 516-17 (1974)
 Compare United States v. Guest, 383 U.S. 745, 783, 86 S.Ct. 1170, 1191, 16 L.Ed.2d 239, 263 (1966) (Brennan, J., concurring) and Action v. Gannon, 450 F.2d 1227, 1235 (8th Cir. 1971) (en banc) with Dombrowski v. Dowling, 459 F.2d 190, 196 (7th Cir. 1972) and Retail Clerks Local 770 v. Retail Clerks Int'l Ass'n, 359 F.Supp. 1285, 1287 (C.D.Cal.1973).
 
 
 [63]
 We would hold that the fourteenth amendment permits Congress to enact the statute if the statute is interpreted as we have suggested it should be: to provide a remedy for private conduct designed to deny a citizen equal protection of the laws because of his membership in a class that is protected by the fourteenth amendment. The class of persons who want to work for a nonunion employer, however, is not thus protected by the fourteenth amendment. We consider, therefore, the question whether Congress relied on the commerce clause in enacting the statute
 
 
 [64]
 See, e.g., Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726, 732 (1942); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937)
 
 
 [65]
 403 U.S. at 105, 91 S.Ct. at 1800, 29 L.Ed.2d at 350
 
 
 [66]
 E.g., United States v. Dewitt, 76 U.S. (9 Wall.) 41, 19 L.Ed. 593 (1870) (invalidating federal statute because the commerce clause was a denial of power to interfere with internal trade and business of the States); Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869) (holding insurance contracts not to be articles of commerce). " 'Relatively little emerges up to the death of (Chief Justice) Waite in 1888, regarding the Court's attitude towards the commerce clause as an affirmative instrument for promoting "commerce among the states." The preoccupation (of earlier periods) is with the restrictive use of the clause.' " J. Nowak, R. Rotunda & J. Young, Handbook on Constitutional Law 134 (1978) (brackets in original) (quoting F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite 7 (1964) (first published 1937)
 
 
 [67]
 See cases cited in note 64 supra
 
 
 [68]
 E.g., 29 U.S.C. § 203(s) (Supp. IV 1980) (defining an enterprise engaged in commerce for purposes of the Fair Labor Standards Act as, inter alia, an enterprise whose annual gross volume of business is not less than $250,000)
 
 
 [69]
 Page 995 supra (emphasis added)
 
 
 [70]
 Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987, 1000 (1944) (Roberts, J., concurring)
 
 
 [71]
 Section 6 of the Norris-LaGuardia Act provides:
 No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
 29 U.S.C. § 106 (emphasis added).
 
 
 [72]
 United Bhd. of Carpenters & Joiners v. United States, 330 U.S. 395, 404, 67 S.Ct. 775, 780, 91 L.Ed. 973, 983 (1947)
 
 
 [73]
 Id. at 404, 407, 67 S.Ct. at 780, 781, 91 L.Ed.2d at 983, 984
 
 
 [74]
 The employer there had attempted to open a mine with miners belonging to a union rival of the United Mine Workers Union. Armed members of the UMW then forcibly prevented the opening of the mine, threatened the employer, and beat an organizer for the rival union. The mine was kept closed by peaceful picketing. Gibbs, the supervisor of the mine, sued for damages caused by the illegal activity. The Supreme Court held that damages flowing from the violence used to close the mine could be recovered under state law, but the Court specifically required use of the clear proof standard
 
 
 [1]
 Comment, A Construction of Section 1985(c) in Light of Its Original Purpose, 46 U.Chi.L.Rev. 402 (1979)